**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-14017-CIV-SMM**
**(Consent Case)**

**TUNA FAMILY MGMT INC.,** *et al.*,

     Plaintiffs,

**v.**

**ALL TRUST MANAGEMENT INC.,** *et al.*,

     Defendants.

_____/

**ORDER ON DEFENDANTS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT (DE 102)**

     This lawsuit stems from a dispute regarding the sale of a corporation, All Trust Management Inc. ("All Trust"), and a related a seafood restaurant known as The Twisted Tuna (the "Restaurant") in Stuart, Florida.  In 2018, Plaintiffs Tuna Family Mgmt Inc. ("Tuna Family"), Kenneth Gibbs III ("Gibbs"), and Rachelle Risley ("Risley") sold All Trust and the Restaurant to Defendants Mad Twist LLC ("Mad Twist") and Mad Twist's Director, Defendant Sidharth Sethi. The sale took place through a series of financial transactions guaranteed by Sidharth Sethi and his father Defendant Amit Sethi, who together owned and operated Defendant SamJ Investments Inc. ("SamJ") and Defendant Italeats Inc. ("Italeats").  SamJ and Italeats offered two other restaurants – 125th Street Grill and Mad Pizza – as collateral for one of several loans used to purchase the Restaurant.  Tuna Family and Mad Twist also entered a Licensing Agreement granting Mad Twist – through All Trust – an exclusive license to operate under The Twisted Tuna trademark and to use intellectual property associated with the trademark within a ten-mile radius from the physical address of the Restaurant (the "Territory").

Since the sale, several disagreements have arisen regarding Defendants' compliance with the financing agreements and the Licensing Agreement, and the propriety of disclosures that Plaintiffs made pertaining to the Restaurant's sale. Both parties have filed motions for partial summary judgment.[1] This Order addresses Defendants' Motion for Partial Summary Judgment (DE 102).[2] I have reviewed the motion and all pertinent portions of the record.[3] For the reasons stated herein, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

The following facts are undisputed.

A. The Restaurant Sale and Financing Agreements

Gibbs and Risley opened the Restaurant in 2014. DE 84 at 33, ¶15; DE 85 at ¶15. They owned the Restaurant through All Trust. DE 86-2 at ¶1; DE 91 at ¶1. On January 13, 2015, they registered the name "The Twisted Tuna" as a federal trademark. DE 109 at ¶44; DE 116 at ¶44. The registration, dated January 13, 2015, reflects that The Twisted Tuna mark (the "Mark") is registered on the principal register for "restaurant and bar services" and was first used in commerce on March 1, 2014. DE 109-1 at 24, 69.

---

[1] Defendants' Motion for Partial Summary Judgment is found in the record at DE 102. Plaintiffs' Motion for Partial Summary Judgment and/or in the Alternative, Motion to Strike Claims Relating to the Lease Issue ("Plaintiffs' Motion") is found in the record at DE 86.

[2] On May 15, 2020, the parties jointly filed a Consent to Proceed Before United States Magistrate Judge ("Consent"). DE 35. Pursuant to the Consent, United States District Judge Donald M. Middlebrooks issued an Order of Reference referring the case to me for all further proceedings including trial and entry of judgment pursuant to 28 U.S.C. § 636(c)(1), Federal Rule of Civil Procedure 73, and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida. DE 36.

[3] Among other filings, I have reviewed the briefing on Plaintiffs' Motion (DE 92; DE 93), the statements of facts related to Plaintiffs' Motion (DE 86-2; DE 91; DE 94), the briefing on Defendants' Motion for Partial Summary Judgment (DE 108; DE 117), the statements of facts related to Defendants' Motion for Partial Summary Judgment (DE 103; DE 109; DE 116), all exhibits to the foregoing docket entries, and all other filings from this case that are referred to in the foregoing docket entries.

In 2017, the Restaurant was listed for sale with Transworld Brokers.  DE 86-2 at ¶3; DE 91 at ¶3.  On or about June 28, 2018, Defendant Sidharth Sethi entered into a contract to purchase the Restaurant ("Stock Sale Agreement").  DE 86-2 at ¶4; DE 91 at ¶4; DE 84-1.  The Stock Sale Agreement indicates that Plaintiffs Gibbs and Risley agreed to sell to Defendant Sidharth Sethi the stock of All Trust and the parking lot for the Restaurant for $3,850,000.  DE 84-1.  Of the total $3,850,000 purchase price, $3,000,000 was allocated to, *inter alia*, purchase of the All Trust stock, and $850,000 was allocated to the purchase of the parking lot.[4]  DE 84-1; DE 103 at ¶7; DE 109 at ¶7.  The closing occurred on November 29, 2018 ("Closing Date").  DE 86-2 at ¶13; DE 91 at ¶13.  On the Closing Date, the parties executed a $1,750,000 note (the "$1.75MM Note") representing additional costs for the purchase, which brought the total purchase price for the restaurant and parking lot to $5,600,000.  DE 83-1 at 68; DE 103 at ¶7; DE 109 at ¶7.

Defendants obtained both third-party financing and seller-financing to accomplish the purchase.  DE 103-1; DE 83-1 at 68-71, 96-98.  Defendant Mad Twist obtained third-party financing through a loan from Midwest Regional Bank (the "Lender") guaranteed by the Small Business Administration ("SBA Loan").[5]  DE 103 at ¶¶2-3, 12; DE 109 at ¶¶2-3, 12.  Defendants Gibbs and Risley provided seller financing consisting of a $490,000 note ("$490k Note") in

---

[4] As explained further below, Defendants received proceeds of a $2,991,000 SBA guaranteed loan of which $1,860,000 was designated for purchase of the All Trust stock.  DE 103-1.

[5] The SBA Guaranty Authorization, issued on October 19, 2018, is for a 75% guarantee of a $2,991,000 loan ("SBA Loan") that Midwest Regional Bank ("Lender") was to extend to Defendants All Trust and Mad Twist.  DE 103-1 at 2, 14.  The use of proceeds is stated to be: (i) $850,000 for purchase of land and improvements; (ii) $1,860,000 for purchase of the ownership interest in All Trust; and (iii) $81,621.88 for the guaranty fee; (iv) $75,000 for the purchase of inventory; (v) $49,378.12 for closing costs; and (vi) $75,000 for working capital.  *Id.* at 6.  Among other provisions, the SBA guaranty authorization requires Lender to obtain a standby creditor's agreement from Plaintiffs Gibbs and Risley for the $490k Note, which provides for the subordination of the $490k Note to the SBA Loan.  *Id.* at 11.  The provision expressly states that monthly payments of $5,440 may be made on the $490k Note so long as Defendants are not in default on the SBA Loan.  *Id.*  The provision also prohibits Plaintiffs Gibbs and Risley from taking action against Defendants All Trust and Mad Twist relative to the $490k Note without the Lender's consent.  *Id.*

addition to financing the additional purchase price amount of $1,750,000 through the $1.75MM Note.  DE 83-1 at 68-71, 96-98; DE 83 at ¶53; DE 84 at ¶53.

The $490k Note, made by Defendants Mad Twist and All Trust on November 29, 2018, carries a 6% interest rate and is payable to Defendants Gibbs and Risley in 120 monthly installments of $5,440.00 each.  DE 83-1 at 96.  The note is secured by a second lien on the business assets of the Restaurant, pursuant to a Security Agreement (the "$490k Security Agreement") entered on the same date, behind the first lien of Midwest Regional Bank.  DE 83-1 at 97; DE 103-6.  Defendant Sidharth signed the $490k Note as an individual guarantor of the note's payment and performance.  DE 83-1 at 98.

The $1.75MM Note, made by Defendants Sidharth Sethi, SamJ, Italeats, Mad Twist, and All Trust on November 29, 2018, carries a 6% interest rate and is payable to Defendants Gibbs and Risley in 120 monthly installments of $19,428.59 each.  DE 109-2 at 5.  The note is secured by a lien on the assets of 125th Street Grill and Mad Pizza pursuant to a Security Agreement (the "$1.75MM Security Agreement") entered on the same date.  *Id.* at 6.  The $1.75MM Security Agreement was made by Defendants Sidharth Sethi, SamJ, Italeats, Mad Twist and All Trust as Debtors, and pledges as security to Plaintiffs Gibbs and Risley the following: (1) all assets of SamJ, Mad Twist, and All Trust; (2) the fixtures furniture, equipment, and inventory of 125th Street Grill, owned by SamJ and located in Seattle, Washington; and (3) the fixtures, furniture, equipment, and inventory of Mad Pizza, owned by Italeats and located in Seattle, Washington.  *Id.* at 10-17.  The $1.75MM Security Agreement requires Defendants "[t]o retain possession of the Collateral during the e[x]istence of [the Security] Agreement."  *Id.* at 11.  As such, the $1.75MM Security Agreement prohibits Defendants from selling, exchanging, assigning, loaning, delivering, leasing, mortgaging, or otherwise disposing of the security pledged except for inventory sold in the

4

ordinary course. *Id.* Sidharth Sethi and his father, Amit Sethi, guaranteed the 1.75MM Note. DE 86-2 at ¶¶10, 12; DE 91 at ¶10, 12; DE 86-2 at ¶12; DE 91 at ¶12; DE 109-2 at 18-23.

B.    The Licensing Agreement

Contemporaneously with closing on the sale of the Restaurant, Tuna Family and Mad Twist entered a Licensing Agreement on November 29, 2018. The Licensing Agreement was between Tuna Family as Licensor and All Trust, owned and controlled by Mad Twist, as Licensee. DE 86-2 at ¶20; DE 91 at ¶20; DE 84 at 54, ¶80; DE 85 at ¶80. The Licensing Agreement grants All Trust a license to operate under The Twisted Tuna trademark within a ten-mile radius from the physical address of the Restaurant (the "Territory"). DE 86-2 at ¶22; DE 91 at ¶22. Under the Licensing Agreement, Tuna Family grants All Trust an exclusive license for use in the Territory and All Trust may use Tuna Family's intellectual property to make, use and apply the Mark in the course of its business. DE 91 at ¶81; DE 94 at ¶81. As Licensor, Tuna Family retains exclusive rights to the Mark outside the Territory; however, it cannot compete with All Trust, as Licensee, within the Territory. *Id.* Tuna Family also agrees in the Licensing Agreement to provide updated operating procedures, new recipes, and any other information necessary for All Trust to successfully operate the business. *Id.*

The Licensing Agreement includes provisions restricting All Trust from: (a) contesting the validity of Tuna Family's rights outside the Territory; (b) taking actions which might impair or interfere with Tuna Family's rights outside the Territory; (c) associating or commingling Tuna Family's intellectual property with other intellectual property without Tuna Family's prior consent; (d) using Tuna Family's intellectual property in an unauthorized manner; and (e) seeking to register any trademark, copyright or industrial design registration anywhere in connection with Tuna Family's intellectual property. DE 86-2 at ¶¶23(a)-(d); DE 91 at ¶¶23(a)-(d). The Licensing

Agreement also provides: "Licensee shall not use the Trademark in a fashion that the Licensor deems to be contrary or may cause a detriment to the brand or concept of the Trademark."  DE 86-2 at ¶31; DE 91 at ¶31.

The Licensing Agreement includes provisions allowing regular, unscheduled, onsite visits by Tuna Family to the Restaurant for inspection of the operations, purchases, policies, preparation, inventory, equipment, recipes, financial, POS system, etc. DE 86-2 at ¶25; DE 91 at ¶25.  Further, the Licensing Agreement provides a thirty-day right to cure a default after receipt of formal notice of same.  DE 86-2 at ¶28; DE 91 at ¶28.  As consideration for the Licensing Agreement, All Trust is required to pay ten dollars per month as a licensing fee, which it has not paid for over a year. DE 86-2 at ¶¶27, 35 (citing Exhibit A at ¶18); DE 91 at ¶¶27, 35; DE 86-3 at 107.

C.       The Lease Agreement

Plaintiffs, through All Trust Management, LLC, as Tenant, entered into a Lease Agreement for the premises housing the Restaurant beginning June 1, 2014, with Red Sky, Inc. as Landlord. DE 86-3 at 205-28.  The initial term of the lease was five years with provision for three subsequent five-year renewals ("Option Terms") to occur automatically in the absence of one-year advance notice of intent not to renew.  *Id.* at 206-07.  The minimum base rent for the first year of the lease was $15,000 per month, or $180,000 per year, with 3% increases for each of the following four years such that rent was expected to be $16,882 per month, or $202,591 per year, in year five.  *Id.* at 208.  The section of the Lease Agreement governing options to renew, section 1.04, states that each of the five-year Option Terms shall be "on the same terms and conditions as this Lease, saving and excepting this option and the *minimum rent which shall adjust to the current fair market rents* at the time of renewal."  *Id.* at 206 (emphasis added).  Further, this section of the Lease states that "[t]he fixed minimum rent *during the initial year of the three (3) Option Terms* shall be Three

Percent (3%) higher than the last year of the previous term." *Id.* at 207 (emphasis added). The Lease also prohibits assignment without prior written consent of the Landlord and states that any assignment or occupancy by another shall not release Plaintiffs, as Tenant, from performance under the Lease. *Id.* at 217.

Plaintiffs knew the lease pertaining to the land and buildings housing the Restaurant was below market rate and was one of the Restaurant's most valuable assets. DE 91 at ¶66; DE 94 at ¶66. The Lease Agreement was provided to Defendant Sidharth Sethi approximately eleven (11) months prior to the closing on the Restaurant for his review and study over that period, and he reviewed the agreement without retaining counsel to review it. DE 86-2 at ¶¶38, 42-43; DE 91 at ¶¶38, 42-43. The Lease Agreement expressly states that the agreement is between All Trust Management, LLC (as Tenant) and Red Sky, Inc. (as Landlord), and these entities are signatories to the lease. DE 86-2 at ¶¶39-40; DE 91 at ¶¶39-40. Plaintiffs voluntarily dissolved All Trust Management, LLC on March 4, 2014, which date was five days after entering into the subject lease. DE 91-18 at 6, p.95:11-p.96:2; DE 91-28 at 6, p.128:14-p. 129:13. Plaintiffs did not provide notice of the dissolution to the Landlord. *Id.* Plaintiffs incorporated All Trust Management, Inc. on March 3, 2014, without notice to the Landlord, and Plaintiffs sold the capital stock of All Trust Management, Inc. to Sidharth Sethi and Mad Twist without notice to the Landlord on November 29, 2018. DE 91-18 at 6, p.96:3-11; DE 91-28 at 6-7, p. 129:1-130:15. All Trust Management, LLC never assigned the lease to All Trust Management, Inc. DE 91 at ¶68; DE 94 at ¶68. Plaintiffs understood the implications – that the Landlord could change the lease rate and possibly add other provisions. DE 91 at ¶69; DE 94 at ¶69; DE 91-29. Thus, Plaintiffs insisted on structuring the sales transactions as a stock sale, representing that the leasehold interest would transfer and avoid renegotiating a new lease with the Landlord. DE 91 at ¶70; DE 94 at ¶70; DE 91-29. Defendant

Sidharth Sethi never spoke to the Landlord prior to closing on the sale of the restaurant.  DE 86-2 at ¶44; DE 91 at ¶44.  On or around May 2019, Defendant Sidharth attempted to exercise the Lease Option Term.  DE 91 at ¶73; DE 94 at ¶73.

On May 27, 2019, Defendants, through All Trust Management, Inc. as Tenant, executed a First Addendum to Indenture of Lease for The Twisted Tuna premises with Red Sky, Inc. as Landlord ("Lease Addendum").  DE 91-20.  The Lease Addendum, among other things, modified the rent due under the Lease.  *Id.*  In particular, the Addendum provides that "the Parties agree the appropriate rent, based upon the current 'Fair Market Value', effective June 1, 2019, is [$21,600] per month."  *Id.*  Although a partial forbearance structure was agreed upon, Defendant All Trust became obligated for the minimum rent amount of $21,600 per month with 3% increases thereafter in the following four years.  *Id.*

### D.    The Fysh Bar & Grill Restaurant in Port Orange, Florida

In 2019, Defendant Sidharth Sethi began exploring an additional restaurant location near Jacksonville, Florida.   On April 10, 2019, Plaintiffs Gibbs and Riley signed a letter on behalf of Tuna Family stating, in part, that "All Trust Management Inc may be granted permission to operate additional business locations . . . in Licensor's sole discretion."  DE 91-17.  On June 26, 2019, Defendant Sidharth Sethi executed a non-binding letter of intent issued by a broker indicating that "Twisted Tuna" would be the tenant of an 8,000 square foot facility in Jacksonville, Florida. DE 86-3 at 166-170.  In September 2019, Sidharth Sethi sent an email discussing terms for a loan, which contained a business plan for "a seafood restaurant in Port Orange" called Fysh Bar & Grill ("Sept. 2019 Business Plan").  DE 86-3 at 142-144; 177-84; DE 103 at ¶47; DE 109 at ¶47; DE 109-11 at 3-9.  In the email, the Sept. 2019 Business Plan includes, in part, the following statements:

1. Summary of Fysh Bar & Grill.  Fysh Bar & Grill will be a replication of our current flagship restaurant, The Twisted Tuna.  Fysh will consist of the same highly successful waterfront, mixed dining concept with a few additions.  Fysh Bar & Grill will serve of [sic] a mix of authentic American, Japanese, and Italian Cuisines within a family friendly atmosphere.  It will have 4 separate kitchens, 3 full bars, a 300-seat banquet facility, daily live entertainment, and an authentic modernized gelato station.

2. Summary of The Twisted Tuna.  The Twisted Tuna has been one of the most successful family owned restaurants in Florida.  The restaurant opened approximately 5 year ago and has been increasing in revenue ever since.  . . . The Twisted Tuna concept consists of multiple different eatery and drinking scenes under one roof along with daily live entertainment, all of which is right on the waterfront.  The restaurant's phenomenal views, entertainment attractions, and wide variety of eating options make The Twisted Tuna an extremely unique and differentiated all-in-one concept.

3. Reason for Rebranding?  The sellers of The Twisted Tuna currently own the brand.  All of our growth strategies need approval from them.  Instead of being limited under their name and policies, we have decided to create our own brand while duplicating our Tuna concept.  . . . Rebranding to Fysh would allow our talented chefs and management team to come together and push ideas which would further enhance our already successful concept.
. . .

   Fysh Bar & Grill will be marketed as a sister company of The Twisted Tuna so we can spread the word of our new brand and gain trust and interest from our current customer base.
. . .

4. Management & Training. . . . We will use our main management members at The Twisted Tuna to train our team in Port Orange.  Our current management understands the ins and outs of our business and will easily be able to train and pass on their knowledge to our Fysh staff.

   Furthermore, training will not be difficult since we are implementing the exact same policies, procedures, and structure within Fysh as we currently have at The Twisted Tuna.
. . .

5. Fysh's menu will be extremely similar to our current menu at The Twisted Tuna, which can be viewed on our website (thetwistedtuna.com).  With that being said, our chefs will train our kitchen staff at Fysh on how to make the exact same food, which has been a pivotal part of our success at The Twisted Tuna.

DE 109-11 at 3-9.

On January 27, 2020, Sidharth Sethi posted a 13-minute documentary video on YouTube about the Fysh Bar & Grill in which he stated that the restaurant's concept was "somewhat based" on The Twisted Tuna.  DE 103 at ¶48 (citing https://www.youtube.com/watch?v=ZUMHs3mJ-wU); DE 109 at ¶48.  Sidharth Sethi also commented that Fysh Bar & Grill would be a waterfront concept with a large menu.  DE 103 at ¶48; DE 109 at ¶48.

On March 10, 2021, Sidharth hosted a groundbreaking ceremony for the Fysh Bar & Grill in Port Orange, Florida.  DE 109 at 12, ¶38; DE 116 at ¶38.  One of the pictures from the ceremony shows a Twisted-Tuna-branded water bottle on a table.  DE 109 at 12, ¶38; DE 116 at ¶38.  The following day, on March 11, 2021, the Daytona Beach News-Journal published an article about the groundbreaking ceremony.  DE 103-12.  The article states in part:

> Rick Julyia, [sic] director of operations for Twisted Tuna, was on hand to take part in the groundbreaking as well as oversee the serving of samples of some of the food Fysh Bar & Grill will offer to the more than 50 people in attendance.
>
> "I will be moving here to oversee this location," he said.  "Great town."  We've been coming here and looking at this location for (nearly) three years."

*Id.* at 4.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indiana of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008).  A fact is material "if it would affect the outcome of the suit under the governing law[.]".  *Id.*

When deciding a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).  Courts do not weigh conflicting evidence or make credibility determinations.  *Furcron*, 843 F.3d at 1304; *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).  If a genuine dispute of material fact exists, the Court must deny summary judgment.  *Skop*, 485 F.3d at 1140.

The moving party bears the initial burden to demonstrate the absence of a genuine issue as to any material fact.  *Fickling v. United States*, 507 F.3d 1302, 1304 (11th Cir. 2007).  "If the moving party meets this burden, the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (internal quotation marks and citation omitted).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

On March 16, 2021, Plaintiffs filed a ten-count Third Amended Complaint ("Complaint") (DE 83) against the Defendants alleging the following causes of action:

| Count | Cause of Action | Against |
|---|---|---|
| I | Infringement of U.S. Trademark No. 4670129 – 15 U.S.C. § 1114(1) | Sidharth Sethi<br>Mad Twist, LLC<br>All Trust Management, Inc. |
| II | Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a) | Sidharth Sethi<br>Mad Twist, LLC<br>All Trust Management, Inc. |
| III | Fraud | Sidharth Sethi<br>Amit Sethi |
| IV | Breach of Promissory Note - $1.75MM | Sidharth Sethi<br>SamJ Investments Inc.<br>Italeats Inc. |

| V | Breach of Absolute Unconditional Continuing Gty Agmt - $1.75MM | Sidharth Sethi Amit Sethi |
| VI | Breach of Guaranty Agreement - $490k | Sidharth Sethi |
| VII | Declaratory Judgment (that Plaintiff Tuna Family Mgmt Inc. is entitled to terminate License Agmt) | All Trust Management, Inc. |
| VIII | Breach of License Agmt | All Trust Management, Inc. |
| IX | Breach of Promissory Notes ($490k and $1.75MM) | Mad Twist, LLC All Trust Management, Inc. |
| X. | Tortious Interference with a Business Relationship | Sidharth Sethi Amit Sethi |

DE 83.

In their Motion for Partial Summary Judgment, Defendants seek summary judgment on Counts I and II alleging trademark infringement, unfair competition, and false designation of origin; Count IV alleging breach of the $1.75MM Note; Count V alleging breach of the guarantee agreements securing the $1.75MM Note; Count VI alleging breach of the guarantee agreement securing the $490k Note; and Count IX alleging breach of the promissory notes for $490,000 and $1.75MM.

Regarding Counts I and II, Defendants argue that Plaintiffs' trademark infringement, unfair competition, and false designation of origin claims fail because Plaintiffs offer no evidence showing a likelihood of consumer confusion or damages.

Regarding Counts IV, V, VI, and IX, Defendant argues that these claims – which all relate to alleged breaches of the 1.75MM and 490k notes or the guarantees securing these notes – are premature because the notes were obtained to satisfy SBA and Lender financing requirements, which prohibit actions to enforce the notes unless the SBA Guaranteed Loan has been satisfied or the Lender consents in writing.  Since the SBA Guaranteed Loan has not been satisfied and no

evidence in the record demonstrates Lender consent, Defendants contend that Counts IV, V, VI, and IX must be dismissed.[6]

I address these arguments in turn.

**A.  Counts I & II: Trademark, Unfair Competition, and False Designation**

Defendants move for summary judgment as to Counts I and II on the basis that Plaintiffs have not produced any evidence to sustain their claims for trademark infringement and unfair competition under the Lanham Act.  DE 102 at 15.  Defendants make two arguments as to these counts.  First, Defendant argue that Plaintiffs have produced no evidence of a likelihood of consumer confusion, which is necessary to sustain claims for trademark infringement and unfair competition.  *Id*.  Second, Defendants contend that the claim of unfair competition separately fails because Plaintiffs have not established any likelihood of damages.[7]  *Id*. at 22.

Plaintiffs must prove the same elements both for trademark infringement under § 32(1), codified at 15 U.S.C. § 1114(1), and for false designation of origin, also referred to as "a federal cause of action for unfair competition," under § 43(a), codified at 15 U.S.C. § 1125(a).  *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017) (citations omitted).  Specifically, Plaintiffs must establish "enforceable trademark rights in a mark or name" and "unauthorized use of its marks such that consumers were likely to confuse the two."  *Id.* (internal quotation marks and citation omitted).

---

[6] Because I find that Defendants are entitled to summary judgment in their favor as to Counts, IV, V, VI, and IX, I do not address Defendants' Ninth Defense that these claims are barred by doctrines of waiver and estoppel and because they are premature, unauthorized and/or Plaintiffs have failed to satisfy conditions precedent.  DE 84 at 29.

[7] Defendants posit that the claim fails even if it is separate from the trademark infringement claim because Plaintiffs provide no evidence addressing the likelihood of damages.  DE 102 at 22.  Because I find that the trademark infringement and unfair competition claims, are coextensive, I do not address Defendants' argument regarding likelihood of damages.

Here, the parties do not dispute the first element.  Indeed, "[t]he owner of a mark on the principal register enjoys . . . a presumption that the mark is valid." *United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2302-04 (2020).  Because The Twisted Tuna Mark is registered on the principal register, it is presumptively valid.  Furthermore, Defendants contest neither the Mark's validity nor that Plaintiffs own it.  Accordingly, Plaintiffs have enforceable trademark rights in The Twisted Tuna name and Mark.

As to the second element, "the touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007).  *See also John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir. 1983) ("[T]he critical question in most actions under § 32(1) is whether there is a likelihood of confusion, mistake, or deception between the registered mark and the allegedly infringing mark"); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 831 (11th Cir. 1982) ("The essential element of an action under § 43(a) is proof by the plaintiff that the alleged infringement by the defendant creates a likelihood of confusion on the part of consumers as to the source of the goods.").[8]  Indeed, claims under both § 1114 and § 1125 "generally turn[] on the confusion analysis." *Savannah Coll. of Art & Design, Inc.*, 872 F.3d at 1261.

To determine if likelihood of confusion exists, courts consider and weigh seven factors: (1) the type/strength of the asserted mark; (2) the similarity of the marks; (3) the similarity of the

---

[8] "Section 32(1) of the Lanham Act, 15 U.S.C.A. § 1114(1), governs lawsuits for the infringement of a federally registered trademark." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir. 1983) ("A defendant is liable for infringement if, without the consent of the registrant, he uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive.").  "[Section] 43(a) . . . expressly prohibit[s] the use of any 'word, term, name, symbol, or device,' or 'false or misleading description of fact' that is likely to cause confusion as to 'affiliation, connection, or association ... with another person,' or as to 'sponsorship, or approval' of goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32, n. 5 (2003) (quoting 15 U.S.C. § 1125(a)).

products and services the marks represent; (4) the similarity of the parties' retail outlets (trade channels) and customers; (5) the similarity of the parties' advertising media; (6) the alleged infringer's intent; and (7) actual confusion.  *Aronowitz v. Health-Chem Corp.*, 513 F.3d 1229, 1239 (11th Cir. 2008); *see also Tana v. Dantanna's*, 611 F.3d 767, 774–75 (11th Cir. 2010).  A court must "fully consider the seven factors, … evaluate the weight to be accorded the individual factors, which varies with the circumstances of the case, and then make its ultimate decision only after doing so."  *J-B Weld Co., LLC v. Gorilla Glue Co.*, 978 F.3d 778, 794 (11th Cir. 2020); *see also Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 649 (recognizing that application of the multi-factor test "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance'").  Among the seven factors, "the type of mark and the evidence of actual confusion are the most important." *Planetary Motion*, 261 F.3d at 1201 n.22 (citing *Dieter*, 880 F.2d at 326).  "Although likelihood of confusion is a question of fact, it may be decided as a matter of law." *Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000).  Courts routinely weigh the likelihood-of-confusion factors on summary judgment.  *Tana*, 611 F.3d at 775 n. 7 (citations omitted).

Defendants argue that Plaintiffs have produced no evidence of consumer confusion. DE 102 at 9-10, 15-22.  Plaintiffs respond that Defendants are illegally using the Mark outside of the geographic area permitted under the License Agreement to gain interest in and support for their new endeavor.  *Id.* at 15-16.  Plaintiffs contend that this use of the Twisted Tuna Mark in association with the opening of the Fysh Bar & Grill results in "certainty of confusion as a matter of law."  DE 108 at 15-16.

"Ordinarily, trademark infringement cases are predicated on the complaint that the defendant employed a trademark so similar to that of the plaintiff that the public will mistake the

defendant's products for those of the plaintiff." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491-92 (11th Cir. 1983) (*citing Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500 (5th Cir. 1980).  However, "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source *or sponsorship* constitutes trademark infringement" as well.  *Id*. at 1492 (*citing Professional Golfers Ass'n of America v. Bankers Life & Casualty Co.*, 514 F.2d 665, 670 (5th Cir. 1975), *cert. denied*, 449 U.S. 1022 (1980)) (emphasis in original). "Thus, a trademark infringement case need not just involve imitation of the registrant's mark.  The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement." *Id.* (citing *Professional Golfers Ass'n*, 514 F.2d at 670.

Plaintiffs' causes of action under the Lanham Act are based on the theory that by using the Twisted Tuna Mark in association with the opening of their new restaurant, the Fysh Bar & Grill, Defendants falsely suggest that Fysh Bar & Grill is sponsored by and affiliated with the Twisted Tuna.  This type of infringement is cognizable under the Lanham Act.  I therefore examine Plaintiffs' proof in light of this enforceable (albeit less common) claim for trademark infringement.

As an initial matter, I consider Plaintiffs' assertion that under the circumstances present here there is a likelihood of confusion "as a matter of law."  DE 108 at 16-17.  For support, Plaintiffs rely on a line of cases in which courts in this Circuit have held that a terminated franchisee's continued operations create "a certainty of confusion" among consumers that the terminated franchisee's products actually are the certified products of the franchisor.  *See*, *e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998); *see also Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983); *Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1504 (S.D. Fla. 1995).  Plaintiffs emphasize that it is "well settled that when a terminated

franchisee continues to use the former franchisor's trademarks without authorization, that conduct, by its very nature, confuses consumers and constitutes trademark infringement." DE 108 at 17 (*citing Peterbrooke Franchising of Am., LLC v. Miami Chocolates, LLC*, 312 F. Supp. 3d 1325, 1339 (S.D. Fla. 2018)). Thus, Plaintiffs contend that I may find likelihood of confusion here without undertaking the seven factor likelihood of confusion test.

Plaintiffs' case is distinct, however, from one in which a franchisor has terminated a franchise agreement and the franchisee continues to operate under the franchisor's mark despite the termination of the agreement authorizing it to do so. In such a case,

> Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. A patron of a restaurant adorned with the Burger King trademarks undoubtedly would believe that [Burger King Corporation] endorses the operation of the restaurant. Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchise therefore would be attributed to [Burger King Corporation]. Because of this risk, many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement.

*Mason*, 710 F.2d at 1492-93.

Here, Plaintiffs have not terminated the License Agreement. Defendants remain authorized to use the Mark according to the terms of the License Agreement. And Plaintiffs are not operating any Twisted Tuna branded restaurant without a valid License Agreement or outside the Territory permitted by the Licensing Agreement. Thus, the "certainty of confusion cases" are not applicable here.

Having dispensed with Plaintiffs' "certainty of confusion as a matter of law" argument, I turn to the question of whether Plaintiffs have put forth sufficient evidence showing Defendants used the Mark in violation of the License Agreement in a manner likely to cause consumer

confusion to survive summary judgment.  I find that they have.  The record contains evidence showing that Defendants used the Twisted Tuna Mark outside the geographic area and in a manner not contemplated by the License Agreement in the following ways:

On June 24, 2019, Defendants filed an application attempting to register the Mark with the Florida Department of State. DE 109 at ¶34(a).  Defendant Amit Sethi testified that he attempted to do this independent of Plaintiffs.  DE 109-9 at 4.  Defendants argue that this filing was a misunderstanding and not an attempt to register the Mark in violation of the Licensing Agreement. Defendants contend, rather, that they received a letter from the government regarding the trademark needing to be renewed as a matter of urgency and that Defendant Amit Sethi submitted the paperwork in an effort to comply and informed Plaintiffs afterwards.  DE 116 at ¶34(a). Plaintiffs maintain that Defendants' attempt to register the Mark was done in conjunction with their efforts to open an unauthorized Twisted Tuna restaurant and that "[a]t no time did Defendants state there was a mistake or mix-up."  DE 109-1 at 5:¶17; 50:¶17.  This is a genuine dispute of material fact that warrants a trial.

On June 25, 2019, Sidharth Sethi executed a Letter of Intent regarding the opening of a Twisted Tuna Restaurant at Beachwalk in St. Johns County, Florida. DE 109-10 at 2-11.  St. Johns County is outside of the Geographic Territory contemplated by the License Agreement.  Plaintiffs contend that Sidharth Sethi executed the Letter of Intent without their written permission.  DE 109 at 34(b).  Defendants contend, however, that the parties negotiated an agreement in April 2019 that allowed Sidharth to explore the St. Johns County opportunity.  DE 116 at 34(b) (citing DE 91-17). This is a genuine dispute of material fact that warrants trial.

 A few months later, on September 22, 2019, Sidharth Sethi presented a business plan for Fysh Bar & Grill (which subsequently opened in St. Johns County) which stated that Defendants'

new restaurant "will be a replication of our current flagship restaurant, The Twisted Tuna."  DE 109-11 at 2-3.  Plaintiffs contend that, having been unsuccessful in obtaining written approval for a Twisted Tuna restaurant, Defendants "decided to just change the name of the prospective restaurant and use all of the Twisted Tuna concepts and menu."  DE 109 at 10, ¶34(b).  Defendant Sidharth Sethi testified in October 2020 that "nothing has been done, nor will [this business plan] be done."  DE 109-8 at 20, 212:23-24.  Defendants contend that they "have not informed anyone the Fysh Bar & Grill will 'be based on the Twisted Tuna concept or otherwise licensed, affiliated or sponsored by Tuna Family.'"  DE 116 at 7, ¶34(b).  This is a genuine dispute of material fact that warrants a trial.

On August 23, 2019, a newspaper article in The Daytona Beach News-Journal quoted Sidharth Sethi as stating that the Fysh Bar & Grill concept was "based off the company's Stuart restaurant, called the Twisted Tuna."  DE 83-1 at 49.  On January 27, 2020, Sidharth Sethi posted a 13-minute documentary video on YouTube about the Fysh Bar & Grill in which he stated that the restaurant's concept was "somewhat based" on The Twisted Tuna.  DE 103 at ¶48 (citing https://www.youtube.com/watch?v=ZUMHs3mJ-wU); DE 109 at ¶48.  On March 10, 2021, Sidharth Seth hosted a groundbreaking ceremony for the Fysh Bar & Grill and one of the pictures from the ceremony shows a Twisted-Tuna-branded water bottle being used on a table as part of the table's display set-up.  DE 109 at 12, ¶38; DE 116 at ¶38.  The following day, on March 11, 2021, the Daytona Beach News-Journal published an article about the groundbreaking ceremony which states in part:

> Rick Julyia, [sic] director of operations for Twisted Tuna, was on hand to take part in the groundbreaking as well as oversee the serving of samples of some of the food Fysh Bar & Grill will offer to the more than 50 people in attendance.
>
> "I will be moving here to oversee this location," he said.  "Great town."  We've been coming here and looking at this location for (nearly) three years."

DE 103-12 at 4.  Plaintiffs contend this is proof that Defendant Sidharth Sethi attempted to unlawfully associate and comingle the Mark with Fysh Bar & Grill, and to suggest that Fysh Bar & Grill came from the same source or was sponsored by The Twisted Tuna.  DE 108 at 3-4. Defendants either deny or minimize Plaintiffs' claims.  This is a genuine dispute of material fact that warrants a trial.

In considering whether Defendants use of the Mark in association with the Fysh Bar & Grill was likely to cause consumer confusion, I find that the record contains sufficient evidence on the relevant factors to warrant a trial.  Although some factors – such as similarity of the marks at issue – do not apply, other factors are quite helpful to the analysis.

### 1.  *Type of Mark*

The first factor requires the Court to determine "the strength and distinctiveness of plaintiff's mark."  *John H. Harland Co.*, 711 F.2d at 973.  The Eleventh Circuit explains that this factor is "the second most important factor in the balance."  *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 938 (11th Cir. 2010).  The fact that a Mark is registered indicates that it is deserving of strong protection.  15 U.S.C. § 1057(b) (stating, *inter alia*, that registration is "prima facie evidence of the validity of the registered mark and . . . of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate").  *See also United States Pat. & Trademark Off. v. Booking.com B. V.*, 140 S. Ct. 2298, 2302 (2020) (instructing that the most distinctive marks are those that qualify for registration).  Here, the Mark is registered for restaurant and bar services. DE 83-1 at 2.  Therefore, I find that it qualifies for strong protection.

Furthermore, "[o]nly distinctive marks are entitled to trademark protection under the Lanham Act."  *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 19-10771, 2021 WL

4438518, at *6 (11th Cir. Sept. 28, 2021) (internal quotations omitted)).  Marks are recognized as falling into four categories in descending order of distinctiveness: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic.  *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007).  "The categories are based on the relationship between the name and the service or good it describes."  *See Frehling Enterprises, Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).  "Also important in gauging the strength of a mark is the degree to which third parties make use of the mark.  The less that third parties use the mark, the stronger it is, and the more protection it deserves."  *Frehling Enterprises, Inc.*, 192 F.3d at 1336 (citations omitted).

Here, I find that Plaintiffs' Mark is at least "suggestive" on the spectrum of distinctiveness.  *Welding Servs., Inc.*, 509 F.3d at 1357.  Nothing about the words "Twisted Tuna" describes a restaurant in the manner that "vision center" describes a place where eyeglasses are sold, which exemplifies a mark that is descriptive if not generic.  *Frehling Enterprises, Inc.*, 192 F.3d at 1335.  Rather, because Tuna is used as food, the Mark could suggest an eatery similar to the way the word penguin suggests a refrigerator (because it is cold).  *Id.*  Since the mark is at least suggestive, it qualifies for strong protection on this basis.

Defendants argue that the Mark is weak based upon third party use because there are restaurants and bars in Florida that have names that begin with "Twisted" or include the word "Tuna."  DE 103 at ¶54 (citing, e.g., Twisted Fin, Twisted Crab, Twisted Fork, Twisted Tavern, Tuna's Raw Bar & Grille).  Defendants maintain that a cursory Google search indicates that at least 30 restaurants or bars, many in Florida, use "Twisted" or Tuna" in their names.  DE 102 at 20.  Defendant relies on *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, where the Eleventh Circuit found that Florida International University ("FIU") "operates in a crowded field of similar names" because of third party use of "Florida" and "University."  830 F.3d 1242, 1257-59.  Even

so, the Circuit Court emphasized that "in assessing the impact of third-party uses, we consider the *entire name* a third party uses, as well as the kind of business in which the user is engaged." *Id.* at 1247 (emphasis added) (internal quotation marks and citation omitted). Here, there is no evidence that third parties, including restaurants or bars, commonly use both terms together, "Twisted" and "Tuna." Thus, given the Mark's registration and its inherent distinctiveness, I conclude that the record contains sufficient evidence to show that the Mark warrants protection and that Plaintiffs' claims should survive summary judgment.

### 2. *Similarity of the Products and Services the Marks Represent*

"This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling Enterprises, Inc.*, 192 F.3d at 1338. Here, The Twisted Tuna, like the planned Fysh Bar & Grill, provides restaurant, bar and entertainment products and services at waterfront locations, including seafood with a large menu. In fact, Defendants acknowledge that the Fysh Bar & Grill's concept is similar to The Twist Tuna. *See* DE 102 at n. 9 (stating that Defendants' references to Fysh Bar & Grill being similar in concept to The Twisted Tuna "are true statements" but denying that the statements can for a basis for Plaintiffs' Lanham Act claims). In a March 2021 article in The Daytona Beach News-Journal, the developer of the location for Fysh Bar & Grill stated that, after "visit[ing] Twisted Tuna in 2019 to check it out, he immediately knew he wanted [Defendant Sidharth Sethi] as the restaurant operator" for the location. DE 103-12 at 2. Based upon Defendant Sidharth Sethi's Sept. 2019 Business Plan, a reasonable inference is that the developer carried an expectation that "Fysh Bar & Grill will be a replication of . . . The Twisted Tuna . . . consist[ing] of the same . . . waterfront, mixed dining concept with a few additions." DE 109-11 at 3. Furthermore, the same March 2021

article reported that "Rick Julyia, director of operation for Twisted Tuna" stated that "[he] will be moving [there] to oversee th[e] [Fysh Bar & Grill] location." *Id.* at 4. The inference is that such a staff move will be in furtherance of making the Fysh Bar & Grill similar to The Twisted Tuna. Therefore, I find that Plaintiffs have put forth evidence sufficient on this factor to proceed to trial.

### 3. Similarity of the Parties' Retail Outlets (Trade Channels) and Customers

The next factor directs a comparison of the parties' sales methods and customer base. *Tana*, 611 F.3d at 778 (accepting the District Court's finding that two restaurants had identical sales outlets as both served food in retail restaurant establishments but finding that, because the restaurants' products were dissimilar, the restaurants at issue had different customer bases). Here, both The Twisted Tuna and the planned Fysh Bar & Grill involve similar retail outlets—waterfront seafood restaurant establishments. Although the distance between the restaurants (160 miles) weighs against customer overlap to some degree, the record contains evidence that Defendant Sidharth Sethi acknowledged an overlap in the customer base. DE 109-8 at 18-20, 210:14-212:24 (Sidharth Sethi acknowledging in his deposition that the Sept. 2019 Business Plan states that Fysh Bar & Grill would "be marketed as a sister company of The Twisted Tuna [in order to] *gain trust and interest from [The Twisted Tuna's] current customer base*"). Thus, there is sufficient evidence in the record on this factor to warrant a trial.

### 4. Similarity of Advertising Media

Next, courts determine whether the parties "engage in similar methods of advertising." *Tana*, 611 F.3d at 778. Although the record contains scant details on this factor, it establishes at least a potential for overlap in the types of advertising media used by The Twisted Tuna and Fysh Bar & Grill. There is record evidence indicating that The Twisted Tuna has a website, a social media presence and sells branded promotional items. DE 86-3 at 131:10-137:19; DE 109-12; DE

109-1 at ¶¶14-16.  With respect to the Fysh Bar & Grill, the record indicates use of, or planned use of, Internet (a website), social media (Facebook), news media, the selling of branded promotional items and YouTube for documentary-type video distribution.  DE 86-3 at 131:10-137:19; 147:10-148:1; DE 109-11; DE 103 at ¶¶46-49. 55.  Furthermore, evidence in the record indicates that Defendants *planned* to replicate successful practices from The Twisted Tuna location to promote the Fysh Bar & Grill.  DE 109-11 at 3.  In their September 2019 business plan, Defendants discuss social media tactics and state that "social media platforms . . . allowed us to present weekly online promotions, menu updates, special events, or other attention-grabbing scenarios [and] was the primary reason for our rocket sales increases at . . . current restaurant projects.  *We will use the same methods with Fysh*."  *Id.* at 9 (emphasis added).  Thus, Plaintiffs establish sufficient evidence on this factor to merit a trial.

### 5.  *Defendant's Intent*

The next factor requires a court to consider [w]hether the defendant intended that purchasers would confuse his service mark with the plaintiff's mark."  *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 840 (11th Cir. 1983).  Here, there is clear evidence in the record that Defendants intended to duplicate The Twisted Tuna by opening the Fysh Bar & Grill in Port Orange, Florida.  Specifically, Defendant Sidharth Sethi's Sept. 2019 Business Plan for Fysh Bar & Grill declared that Defendants planned to replicate The Twisted Tuna.  DE 109-11 at 3.  The same business plan stated that Defendants would "use [the] main management members at The Twisted Tuna to train [the] team in Port Orange" and also stated that "training [would] not be difficult since [they] would be implementing the exact same policies, procedures and structure within Fysh as [they] currently have at The Twisted Tuna."  *Id.* at 3-4.  In his deposition, Defendant Sidharth Sethi also acknowledged his intent to market Fysh Bar & Grill as a sister company of The

Twisted Tuna to "gain trust and interest from [the] current customer base". DE 109-8 at 20, 212:10-24. On January 27, 2020, Defendant Sidharth Sethi indicated in a YouTube video that the Fysh Bar & Grill's concept was "somewhat based" on The Twisted Tuna. *See* https://www.youtube.com/watch?v=ZUMHs3mJ-wU (last visited Jun. 15, 2022). Further, in a September 22, 2021 news article that Defendants themselves put on the record, Defendant Sidharth Sethi reported the move of The Twisted Tuna's Director of Operations, Rick Julylia, to Port Orange as Fysh Bar & Grill's Director of Operations. DE 116-3 at 3. Thus, Defendants are well-positioned to carry out the replication declared in the Sept. 2019 Business Plan. Accordingly, the record evidence regarding this factor is sufficient to justify a trial.

### 6.  *Actual Confusion*

"The last factor, actual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion." *Tana*, 611 F.3d at 779. Here, the Fysh Bar & Grill had not yet opened so evidence of actual customer confusion does not exist since there have not been actual customers yet. The Court looks, therefore, at other evidence showing a potential of consumer confusion. The record indicates that news articles have associated Fysh Bar & Grill with The Twisted Tuna. For example, Plaintiffs' complaint asserts that, after a Daytona Beach News-Journal story was published on August 23, 2019, they received numerous phone calls from friends, family and industry professionals inquiring whether they were associated with the Fysh Bar & Grill endeavor. DE 83 at ¶¶22-23, 77. Although evidence of record to support this assertion is lacking, the article itself credits Defendant Sidharth Sethi with saying that the Fysh Bar & Grill "concept is based off the company's Stuart restaurant called the Twisted Tuna." DE 83-1 at 49.

Plaintiffs also note an instance of confusion after Defendants renewed their efforts with Fysh Bar & Grill in March 2021 and another article appeared then in the Daytona Beach News-

Journal featuring "Twisted Tuna branded merchandise (e.g., branded cups in center facing camera) and food items." *Id*. Plaintiffs contend that, following that March 2021 article, one vendor contacted them believing Fysh Bar & Grill "was a Twisted Tuna enterprise." *Id.* at 5. Plaintiffs proffer a May 20, 2021 email from the broker, who was soliciting Plaintiffs to lease property, stating as follows:

> We are looking for a 20 year term + renewals. Asking price is $150/year. We will allow some credit back for rent to offset construcion costs. *I was talking to Port Orange City Manager earlier this week and he was telling us about your project.* I think you could be a great fit for the Port as well.

DE 109-15. Although I noted that the vendor's email came well after the March 2021 article for purposes of Plaintiffs carrying their burden to show cause for a preliminary injunction, I find that this evidence, along with other evidence, is sufficient to survive summary judgment. DE 119 at 13. As previously discussed, there is evidence of Defendants' intent to leverage the reputation of, and duplicate, The Twisted Tuna in the record. Therefore, I consider the issue of likely consumer confusion best addressed at trial.

In sum, a trademark claim is established so long as the trademark was employed in a manner that was likely to cause confusion, mistake or to deceive. *Burger King v. Mason*, 710 F.2d 1480, 1491-92 (11th Cir. 1983). Plaintiffs have put forth evidence of several representations by Defendants from which a patron of Fysh Bar & Grill could believe that the Twisted Tuna endorses the operation of the Fysh, Bar and Grill. Depending on the level of similarity between the two restaurants, which has yet to be proven at trial, consumers could associate the Fysh Bar and Grill with the Twisted Tuna and assume they are affiliated. Any shortcomings of Fysh Bar & Grill could therefore be imputed to the Twisted Tuna. Because of this risk, I find that Plaintiffs have at minimum set forth sufficient facts to survive summary judgment.

Accordingly, because I find that Plaintiffs' Mark warrants strong protection and because Defendants have so blatantly indicated an intent to replicate The Twisted Tuna in Port Orange through their planned opening of Fysh Bar & Grill, I conclude that Defendants fail to carry their burden to establish the absence of a genuine dispute as to a material fact relative to Counts 1 and 2.  Thus, Defendants' motion for partial summary judgment on Counts 1 and 2 is denied.

### B.  Counts IV, V, VI, and IX: Breach of the Notes and Guarantees

Defendants argue that Plaintiffs have not satisfied conditions precedent to maintain their claims on the $490k Note and the $1.75MM Note.  I agree.  Under Florida law, contract interpretation begins with plain meaning of words used, and words are "to be given their natural, ordinary meaning."  *See Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp.3d 1363, 1371 (S.D. Fla. 2016).  Where a contract is unambiguous, it must be interpreted in accordance with its plain meaning so as to give effect to the contract as a whole.  *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla. 2013).  Courts may draw reasonable inferences from unambiguous contract language to determine what the parties intended.  *Bombardier Capital Inc. v. Progressive Mktg. Grp., Inc.*, 801 So.2d 131, 134 (Fla. 4th DCA 2001).

The record is undisputed that to obtain SBA guaranteed financing to purchase the Restaurant, Mad Twist and All Trust had to obtain "subordinate funding," specifically "the proceeds of a loan from Kenny Gibbs and Rachelle Risley in the amount of $490,000 for a term of not less than 10.0 years."  SBA Authorization (SBA 7(a) Guaranteed Loan), DE 103-1 at 10. The SBA required the $490,000 loan "be subordinate to the SBA Loan."  *Id*.  The SBA also required a "Standby Creditor's Agreement from Kenny Gibbs and Rachelle Risley for $490,000, plus all accrued and future interest (Standby Debt)."  *Id*. at Section I.6.  Moreover, the SBA required that:

> Standby Creditor must subordinate any lien rights in collateral securing the Loan to Lender's rights in the collateral and take no action against Borrower or any collateral securing the Standby Debt without Lender's consent.  Lender must attach a copy of the Standby Note evidencing the Standby Debt to the Standby Creditor's Agreement.  Lender may use its own form or SBA Form 155.

Section I.6.

Pursuant to this SBA requirement, Gibbs and Risley loaned $490,000 to Mad Twist and All Trust and signed a Standby Creditors Agreement "[t]o induce Midwest Regional Bank (Lender) to make an SBA guaranteed loan."  DE 103-9.  The Standby Creditors Agreement acknowledged that All Trust and Mad Twist owed $490,000 (the Standby Loan) to Plaintiffs.  Plaintiffs agreed in the Standby Creditors Agreement "to take no action to enforce claims" against Mad Twist & All Trust on the Standby Loan "until the Lender's Loan is satisfied." *Id.* at ¶3.  They also agreed "to sign appropriate documentation required by Lender to subordinate to Lender's Loan secured interests in collateral that secures the Standby Loan."  *Id.* at ¶5.  Further, Plaintiffs agreed "to take no action against" Mad Twist and All Trust's "collateral, without written consent from the Lender, until Lender's Loan is satisfied." *Id.* at ¶4.  They also agreed that "Additional Loans made by Standby Creditor will be subject to the terms of this Agreement, unless Lender agrees otherwise in writing."  *Id.* at ¶8.  Moreover, by its plain language, the Standby Creditors Agreement "applies to … guarantors or sureties of the Standby Creditor Loan."  *Id.* at ¶7.

It is undisputed that the SBA guaranteed a loan of $2,991,000 to finance the Restaurant sale.  It is also undisputed that, to induce the Lender to make that loan, Plaintiffs agreed to be "Standby Creditors"; in other words, Plaintiffs would "standby" by subordinating any lien rights in collateral securing their loan to the SBA Lender's rights in the collateral and by taking no action against the borrower (here, Defendants All Trust and Mad Twist) or on any collateral securing the Standby Debt without the Lender's approval.   The record contains no evidence showing that the

SBA Guaranteed Loan has been satisfied or that Plaintiffs have obtained written consent from the Lender. Therefore, pursuant to the plain language of the Standby Creditors Agreement, Plaintiffs may not take action to enforce obligations under the $490k Note (the Standby Debt). Plaintiffs also may take no action against collateral securing the $490k Note. Likewise, Plaintiffs' loan of 1.75MM to Mad Twist and All Trust constitutes an "[A]dditional Loan[]" made by the Standby Creditor." As such, it also is subject to the plain terms of the Standby Creditor's Agreement absent Lender agreement otherwise. *Id.* at ¶8. Plaintiffs therefore may not take action to enforce obligations under the 1.75MM Note or against any collateral securing the $1.75MM Note.

In Count IX of the Complaint, Plaintiffs sue Mad Twist and All Trust for breach of the $490k and $1.75MM Promissory Notes. As set forth above, both Notes are covered by the Standby Creditors Agreement. Thus, Plaintiffs may not take action to enforce these Notes absent satisfaction of the Lender's Loan or the Lender's express written consent.

In Count VI of the Complaint, Plaintiffs sue Siddharth Sethi for breach of his agreement to guarantee the $490k Note. Plaintiffs cannot proceed on Count VI because the Standby Creditors Agreement prohibits Plaintiffs from taking action against Mad Twist and All Trust "to enforce claims . . . until the Lender's Loan is satisfied." DE 83-1 at 98; DE 103-9 at ¶3. Plaintiffs agreed not to pursue their right to collect the $490k Note, which rights are pursued, at a minimum, by taking action to declare Mad Twist and All Trust in default. Sidharth Sethi's guaranty on the face of the $490k Note states that he "guarantees the payment and performance of th[e] Note . . . in the event of [Mad Twist's and All Trust's] default." DE 83-1 at 98. Thus, collecting from Defendant Sidharth Sethi on his guarantee would require Plaintiffs to declare Mad Twist and All Trust in default in order to enforce their right to receive repayment of the $490,000 loan. Plaintiffs agreed not to take such action before the Lender's Loan was repaid. Consistent with Plaintiffs' agreement

to not take such action, the SBA Authorization refers to the $490k loan as "Subordinate Funding," and requires that the $490,000 loan "be subordinate to the SBA Loan." DE 103-1 at 10. The subordination carried through in the Standby Creditor's Agreement, via the provision, among others, that allowed Lender to "[d]eclare a default . . . and notify Standby Creditor to stop accepting payments." DE 103-9 at ¶6(f). Accordingly, Plaintiffs may not take any action to enforce the guaranty agreement securing the $490k Note at this time because they agreed to take no action against Mad Twist and All Trust to enforce their rights to collect.

In Count IV of the Complaint, Plaintiffs sue Sidharth Sethi, SAMJ Investments and Italeats for breach of the 1.75MM Note and related Security Agreement. Since the 1.75MM Note and the related Security Agreement are "Additional Loans" subject to the terms of the Standby Creditors Agreement, including the no-action clause, Plaintiffs may not take action to enforce the 1.75MM Note or its related Security Agreement at this time.

In Count V of the Complaint, Plaintiffs sue Siddharth Sethi and Amit Sethi for breach of their agreements to guarantee the 1.75MM Note. Plaintiffs cannot proceed on Count V at this time for the following reasons. First, under the Standby Creditors Agreement, Plaintiffs are not allowed to take action to enforce claims against Mad Twist and All Trust on "Additional Loans." DE 103-9 at ¶¶3,8. The guarantee agreements state that the guarantors "agree to pay and/or perform punctually each . . . Obligation which is not paid or performed as and when due and payable by [Sidharth Sethi, SamJ, Italeats, Mad Twist and All Trust as Makers]." DE 109-2 at 18, 21. As previously explained, Plaintiffs' action to collect upon guarantees given non-payment by the Makers constitutes an action to enforce their claims—here, as to Additional Loans—which they agreed not to do. Second, in their Response, Plaintiffs argue that the Standby Creditor's Agreement does not prevent action against Siddharth and Amit Sethi as guarantors, but this view

is based on their mistaken premise that the Standby Creditor's Agreement does not "mention or even reference the Guarantors." DE 108 at 7. That is plainly incorrect. The Standby Creditor's Agreement, which is only two pages long, states clearly in paragraph 7 that "[t]his Agreement applies to … guarantors or sureties of Standby Creditor Loan." DE 103-9 at ¶7. Given this plain language, Plaintiffs' other arguments, which are based on various tenets of contract interpretation, are inapplicable. As Plaintiffs themselves point out, "when the language of a contract is clear and unambiguous, courts must give effect to the contract as written and cannot engage in interpretation or construction as the plain language is the best evidence of the parties' intent." *Talbott v. First Bank Fla., FSB*, 59 So.3d 243, 245 (Fla. 4th DCA 2011). "[T]he courts task is to apply the parties' contract as written, not 'rewrite' it under the guise of judicial construction." *City of Pompano Beach v. Beatty*, 222 So.3d 598, 600 (Fla. 4th DCA 2017).

Third, even if this Court found an ambiguity existed with respect to pursuit of guarantors,[9] the intent of the parties as evident from the contemporaneously executed documents would contradict Plaintiffs' contention that the guarantees are outside the Standby Creditor's Agreement. *See Gold Crown Resort Mktg. Inc. v. Phillpotts*, 272 So. 3d 789, 792 (Fla. 5th DCA 2019) ("Contracts should be construed to give effect to the intentions of the parties."); *MV Ins. Consultants v. NAFH Nat. Bank*, 87 So. 3d 96, 99 (Fla. 3d DCA 2012) (finding it appropriate to construe documents as a single contract that were "executed contemporaneously, . . . interconnected, and relate[d] to the same transaction"). As previously discussed with respect to the $490k Note, the loan documents indicate that the parties intended for Standby Debt to be

---

[9] The provision regarding "guarantors or sureties," follows language referring to any "successor" or "assignee" of the Standby Creditor or Standby Creditor's loan *including* guarantors or sureties. Therefore, the provision may arguably refer to guarantors or sureties that become successors or assignees. Even so, for reasons herein explained, the transaction viewed as a whole indicates that the parties intended that the Standby Creditor's Agreement would limit Plaintiffs' ability to pursue collection of the $490k Note and $1.75MM Note without Lender's consent before Lender's loan was satisfied.

subordinate to the Lender's Loan.  The subordination was to be effected by the Standby Creditor's Agreement, which agreement also applies to Additional Loans.[10]  Thus, Plaintiffs may not take action against guarantors securing the Standby Debt (i.e., the $490k Note) or against guarantors securing "Additional Loans" (i.e., the $1.75MM Note) without Lender consent.

Here, the language of the Standby Creditor's Agreement – which Plaintiffs signed – is clear and unambiguous.  Plaintiffs' obligation under the Standby Creditor's Agreement they voluntarily entered was <u>not to take any action</u> to enforce the terms of the loans against Mad Twist and All Trust directly or to collect indirectly from guarantors or security by declaring Mad Twist and All Trust in default without Lender's consent.  While Plaintiffs may be frustrated by breaches of the debt, security, and/or guarantee agreements, they cannot at present take any action to compel payment due to the bargain they made.  Accordingly, Defendants' motion for summary judgment on Counts IV, V, VI, and IX is therefore granted without prejudice.  Plaintiffs may refile these claims after meeting the preconditions set forth in the Standby Creditor's Agreement.

---

[10] Standby Creditor's Agreements routinely serve to subordinate repayment of standby creditor loans and cash injections in SBA guaranteed loan transactions.  *See*, e.g., *United States v. Norris*, No. 08-CR-343, 2011 WL 13127987, at *8 (N.D.N.Y. May 23, 2011) (noting in a bank fraud case that the "SBA required [a purported standby creditor] to sign a Standby Creditor's Agreement whereby [he] agreed not to accept repayment of [an] $834,000 equity or cash infusion until the subject [SBA] loan had been repaid"); *MPB Collection LLC v. Everest Nat'l Ins. Co.*, No. CV-17-04022-PHX-GMS, 2019 WL 5789469, at *1-3 (D. Ariz. Nov. 6, 2019), *judgment entered sub nom. MBP Collection LLC v. Everest Nat'l Ins. Co.*, No. CV-17-04022-PHX-GMS, 2020 WL 4692463 (D. Ariz. Jan. 27, 2020) (noting that Standby Creditor's Agreements provided "that the creditors would not accept payments on [borrower's] debt to them [for a certain period] and that the creditors would turn over any payments received from [borrower] in violation of the Agreement"); *In re Green Goblin, Inc.*, No. CIV.A. 12-4076, 2014 WL 5800601, at *6 (E.D. Pa. Nov. 6, 2014) (finding that standby creditors understood "they would be deferring the right to be repaid as well as their right to exercise contract default remedies" in SBA guaranteed loan transaction).  As the *In re Green Goblin, Inc.* Court found, the SBA lender in that case demanded restrictions on standby creditors' collection rights "to maximize its ability to obtain repayment of its loan;" and, without the standby agreement, "[lender] would not provide the . . . financing."  2014 WL 5800601, at *6-7.

## CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion for Partial Summary Judgement ("Motion") (DE 102) is **GRANTED IN PART AND DENIED IN PART**.  Defendants' Motion is **GRANTED** on Counts IV, V, VI, and IX, and those Counts are dismissed without prejudice. Defendants' Motion is **DENIED** on Counts 1 and 2, and those Counts shall proceed to trial.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 22nd day of June, 2022.

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE