**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-14017-CIV-SMM**
**(Consent Case)**

**TUNA FAMILY MGMT INC.**, *et al.*,

      Plaintiffs,

**v.**

**ALL TRUST MANAGEMENT INC.**, *et al.*,

      Defendants.

_____/

<u>**ORDER ON PLAINTIFFS' MOTION FOR**</u>
<u>**PARTIAL SUMMARY JUDGMENT (DE 86)**</u>

      This lawsuit stems from a dispute regarding the sale of a corporation, All Trust Management Inc. ("All Trust"), and a related a seafood restaurant known as The Twisted Tuna (the "Restaurant") in Stuart, Florida.  In 2018, Plaintiffs Tuna Family Mgmt Inc. ("Tuna Family"), Kenneth Gibbs III ("Gibbs"), and Rachelle Risley ("Risley") sold All Trust and the Restaurant to Defendants Mad Twist LLC ("Mad Twist") and Mad Twist's Director, Defendant Sidharth Sethi.  The sale took place through a series of financial transactions guaranteed by Sidharth Sethi and his father Defendant Amit Sethi, who together owned and operated Defendant SamJ Investments Inc. ("SamJ") and Defendant Italeats Inc. ("Italeats").  SamJ and Italeats offered two other restaurants – 125th Street Grill and Mad Pizza – as collateral for one of several loans used to purchase the Restaurant.  Tuna Family and Mad Twist also entered a Licensing Agreement granting Mad Twist – through All Trust – an exclusive license to operate under The Twisted Tuna trademark and to use intellectual property associated with the trademark within a ten-mile radius from the physical address of the Restaurant (the "Territory").

Since the sale, several disagreements have arisen regarding Defendants' compliance with the financing agreements and the Licensing Agreement, and the propriety of disclosures that Plaintiffs made pertaining to the Restaurant's sale.  Both parties have filed motions for partial summary judgment.[1]  This Order addresses Plaintiffs' Motion for Partial Summary Judgment (DE 86).[2]  I have reviewed the motion and all pertinent portions of the record.[3]  For the reasons stated herein, Plaintiffs' Motion for Partial Summary Judgment is **DENIED**.

## **BACKGROUND**

The following facts are undisputed.

A.   The Restaurant Sale and Financing Agreements

Gibbs and Risley opened the Restaurant in 2014.  DE 84 at 33, ¶15; DE 85 at ¶15. They owned the Restaurant through All Trust.  DE 86-2 at ¶1; DE 91 at ¶1.  On January 13, 2015, they registered the name "The Twisted Tuna" as a federal trademark.  DE 109 at ¶44; DE 116 at ¶44. The registration, dated January 13, 2015, reflects that The Twisted Tuna mark (the "Mark") is registered on the principal register for "restaurant and bar services" and was first used in commerce on March 1, 2014.  DE 109-1 at 24, 69.

---

[1] Plaintiffs' Motion for Partial Summary Judgment and/or in the Alternative, Motion to Strike Claims Relating to the Lease Issue is found in the record at DE 86.  Defendants' Motion for Partial Summary Judgment is found in the record at DE 102.

[2] On May 15, 2020, the parties jointly filed a Consent to Proceed Before United States Magistrate Judge ("Consent"). DE 35.  Pursuant to the Consent, United States District Judge Donald M. Middlebrooks issued an Order of Reference referring the case to me for all further proceedings including trial and entry of judgment pursuant to 28 U.S.C. § 636(c)(1), Federal Rule of Civil Procedure 73, and the Magistrate Judge Rules of the Local Rules of the Southern District of Florida.  DE 36.

[3]. Among other filings, I have reviewed the briefing on Plaintiffs' Motion for Partial Summary Judgment (DE 92; DE 93), the statements of facts related to Plaintiffs' Motion for Partial Summary Judgement (DE 86-2; DE 91; DE 94), the briefing on Defendants' Motion for Partial Summary Judgment (DE 108; DE 117), the statements of facts related to Defendants' Motion for Partial Summary Judgment (DE 103; DE 109; DE 116), all exhibits to the foregoing docket entries, and all other filings from this case that are referred to in the foregoing docket entries.

In 2017, the Restaurant was listed for sale with Transworld Brokers.  DE 86-2 at ¶3; DE 91 at ¶3.  On or about June 28, 2018, Defendant Sidharth Sethi entered into a contract to purchase the Restaurant ("Stock Sale Agreement").  DE 86-2 at ¶4; DE 91 at ¶4; DE 84-1.  The Stock Sale Agreement indicates that Plaintiffs Gibbs and Risley agreed to sell to Defendant Sidharth Sethi the stock of All Trust and the parking lot for the Restaurant for $3,850,000.  DE 84-1.  Of the total $3,850,000 purchase price, $3,000,000 was allocated to, *inter alia*, purchase of the All Trust stock, and $850,000 was allocated to the purchase of the parking lot.[4]  DE 84-1; DE 103 at ¶7; DE 109 at ¶7.  The closing occurred on November 29, 2018 ("Closing Date").  DE 86-2 at ¶13; DE 91 at ¶13.  On the Closing Date, the parties executed a $1,750,000 note (the "$1.75MM Note") representing additional costs for the purchase, which brought the total purchase price for the restaurant and parking lot to $5,600,000.  DE 83-1 at 68; DE 103 at ¶7; DE 109 at ¶7.

Defendants obtained both third-party financing and seller-financing to accomplish the purchase.  DE 103-1; DE 83-1 at 68-71, 96-98.  Defendant Mad Twist obtained third-party financing through a loan from Midwest Regional Bank (the "Lender") guaranteed by the Small Business Administration ("SBA Loan").[5]  DE 103 at ¶¶2-3, 12; DE 109 at ¶¶2-3, 12.  Defendants Gibbs and Risley provided seller financing consisting of a $490,000 note ("$490k Note") in

---

[4] As explained further below, Defendants received proceeds of a $2,991,000 SBA guaranteed loan of which $1,860,000 was designated for purchase of the All Trust stock.  DE 103-1.

[5] The SBA Guaranty Authorization, issued on October 19, 2018, is for a 75% guarantee of a $2,991,000 loan ("SBA Loan") that Midwest Regional Bank ("Lender") was to extend to Defendants All Trust and Mad Twist.  DE 103-1 at 2, 14.  The use of proceeds is stated to be: (i) $850,000 for purchase of land and improvements; (ii) $1,860,000 for purchase of the ownership interest in All Trust; and (iii) $81,621.88 for the guaranty fee; (iv) $75,000 for the purchase of inventory; (v) $49,378.12 for closing costs; and (vi) $75,000 for working capital.  *Id.* at 6.  Among other provisions, the SBA guaranty authorization requires Lender to obtain a standby creditor's agreement from Plaintiffs Gibbs and Risley for the $490k Note, which provides for the subordination of the $490k Note to the SBA Loan.  *Id.* at 11.  The provision expressly states that monthly payments of $5,440 may be made on the $490k Note so long as Defendants are not in default on the SBA Loan.  *Id.*  The provision also prohibits Plaintiffs Gibbs and Risley from taking action against Defendants All Trust and Mad Twist relative to the $490k Note without the Lender's consent.  *Id.*

addition to financing the additional purchase price amount of $1,750,000 through the $1.75MM Note.  DE 83-1 at 68-71, 96-98; DE 83 at ¶53; DE 84 at ¶53.

The $490k Note, made by Defendants Mad Twist and All Trust on November 29, 2018, carries a 6% interest rate and is payable to Defendants Gibbs and Risley in 120 monthly installments of $5,440.00 each.  DE 83-1 at 96.  The note is secured by a second lien on the business assets of the Restaurant, pursuant to a Security Agreement (the "$490k Security Agreement") entered on the same date, behind the first lien of Midwest Regional Bank.  DE 83-1 at 97; DE 103-6.  Defendant Sidharth signed the $490k Note as an individual guarantor of the note's payment and performance.  DE 83-1 at 98.

The $1.75MM Note, made by Defendants Sidharth Sethi, SamJ, Italeats, Mad Twist, and All Trust on November 29, 2018, carries a 6% interest rate and is payable to Defendants Gibbs and Risley in 120 monthly installments of $19,428.59 each.  DE 109-2 at 5.  The note is secured by a lien on the assets of 125th Street Grill and Mad Pizza pursuant to a Security Agreement (the "$1.75MM Security Agreement") entered on the same date.  *Id.* at 6.  The $1.75MM Security Agreement was made by Defendants Sidharth Sethi, SamJ, Italeats, Mad Twist and All Trust as Debtors, and pledges as security to Plaintiffs Gibbs and Risley the following: (1) all assets of SamJ, Mad Twist, and All Trust; (2) the fixtures furniture, equipment, and inventory of 125th Street Grill, owned by SamJ and located in Seattle, Washington; and (3) the fixtures, furniture, equipment, and inventory of Mad Pizza, owned by Italeats and located in Seattle, Washington.  *Id.* at 10-17.  The $1.75MM Security Agreement requires Defendants "[t]o retain possession of the Collateral during the e[x]istence of [the Security] Agreement."  *Id.* at 11.  As such, the $1.75MM Security Agreement prohibits Defendants from selling, exchanging, assigning, loaning, delivering, leasing, mortgaging, or otherwise disposing of the security pledged except for inventory sold in the

4

ordinary course. *Id.* Sidharth Sethi and his father, Amit Sethi, guaranteed the 1.75MM Note. DE 86-2 at ¶¶10, 12; DE 91 at ¶10, 12; DE 86-2 at ¶12; DE 91 at ¶12; DE 109-2 at 18-23.

      B.     The Licensing Agreement

Contemporaneously with closing on the sale of the Restaurant, Tuna Family and Mad Twist entered a Licensing Agreement on November 29, 2018. The Licensing Agreement was between Tuna Family as Licensor and All Trust, owned and controlled by Mad Twist, as Licensee. DE 86-2 at ¶20; DE 91 at ¶20; DE 84 at 54, ¶80; DE 85 at ¶80. The Licensing Agreement grants All Trust a license to operate under The Twisted Tuna trademark within a ten-mile radius from the physical address of the Restaurant (the "Territory"). DE 86-2 at ¶22; DE 91 at ¶22. Under the Licensing Agreement, Tuna Family grants All Trust an exclusive license for use in the Territory and All Trust may use Tuna Family's intellectual property to make, use and apply the Mark in the course of its business. DE 91 at ¶81; DE 94 at ¶81. As Licensor, Tuna Family retains exclusive rights to the Mark outside the Territory; however, it cannot compete with All Trust, as Licensee, within the Territory. *Id.* Tuna Family also agrees in the Licensing Agreement to provide updated operating procedures, new recipes, and any other information necessary for All Trust to successfully operate the business. *Id.*

The Licensing Agreement includes provisions restricting All Trust from: (a) contesting the validity of Tuna Family's rights outside the Territory; (b) taking actions which might impair or interfere with Tuna Family's rights outside the Territory; (c) associating or commingling Tuna Family's intellectual property with other intellectual property without Tuna Family's prior consent; (d) using Tuna Family's intellectual property in an unauthorized manner; and (e) seeking to register any trademark, copyright or industrial design registration anywhere in connection with Tuna Family's intellectual property. DE 86-2 at ¶¶23(a)-(d); DE 91 at ¶¶23(a)-(d). The Licensing

Agreement also provides: "Licensee shall not use the Trademark in a fashion that the Licensor deems to be contrary or may cause a detriment to the brand or concept of the Trademark."  DE 86-2 at ¶31; DE 91 at ¶31.

The Licensing Agreement includes provisions allowing regular, unscheduled, onsite visits by Tuna Family to the Restaurant for inspection of the operations, purchases, policies, preparation, inventory, equipment, recipes, financial, POS system, etc. DE 86-2 at ¶25; DE 91 at ¶25.  Further, the Licensing Agreement provides a thirty-day right to cure a default after receipt of formal notice of same.  DE 86-2 at ¶28; DE 91 at ¶28.  As consideration for the Licensing Agreement, All Trust is required to pay ten dollars per month as a licensing fee, which it has not paid for over a year. DE 86-2 at ¶¶27, 35 (citing Exhibit A at ¶18); DE 91 at ¶¶27, 35; DE 86-3 at 107.

C.     The Lease Agreement

Plaintiffs, through All Trust Management, LLC, as Tenant, entered into a Lease Agreement for the premises housing the Restaurant beginning June 1, 2014, with Red Sky, Inc. as Landlord. DE 86-3 at 205-28.  The initial term of the lease was five years with provision for three subsequent five-year renewals ("Option Terms") to occur automatically in the absence of one-year advance notice of intent not to renew.  *Id.* at 206-07.  The minimum base rent for the first year of the lease was $15,000 per month, or $180,000 per year, with 3% increases for each of the following four years such that rent was expected to be $16,882 per month, or $202,591 per year, in year five.  *Id.* at 208.  The section of the Lease Agreement governing options to renew, section 1.04, states that each of the five-year Option Terms shall be "on the same terms and conditions as this Lease, saving and excepting this option and the *minimum rent which shall adjust to the current fair market rents* at the time of renewal."  *Id.* at 206 (emphasis added).  Further, this section of the Lease states that "[t]he fixed minimum rent *during the initial year of the three (3) Option Terms* shall be Three

6

Percent (3%) higher than the last year of the previous term." *Id.* at 207 (emphasis added). The Lease also prohibits assignment without prior written consent of the Landlord and states that any assignment or occupancy by another shall not release Plaintiffs, as Tenant, from performance under the Lease. *Id.* at 217.

Plaintiffs knew the lease pertaining to the land and buildings housing the Restaurant was below market rate and was one of the Restaurant's most valuable assets. DE 91 at ¶66; DE 94 at ¶66. The Lease Agreement was provided to Defendant Sidharth Sethi approximately eleven (11) months prior to the closing on the Restaurant for his review and study over that period, and he reviewed the agreement without retaining counsel to review it. DE 86-2 at ¶¶38, 42-43; DE 91 at ¶¶38, 42-43. The Lease Agreement expressly states that the agreement is between All Trust Management, LLC (as Tenant) and Red Sky, Inc. (as Landlord), and these entities are signatories to the lease. DE 86-2 at ¶¶39-40; DE 91 at ¶¶39-40. Plaintiffs voluntarily dissolved All Trust Management, LLC on March 4, 2014, which date was five days after entering into the subject lease. DE 91-18 at 6, p.95:11-p.96:2; DE 91-28 at 6, p.128:14-p. 129:13. Plaintiffs did not provide notice of the dissolution to the Landlord. *Id.* Plaintiffs incorporated All Trust Management, Inc. on March 3, 2014, without notice to the Landlord, and Plaintiffs sold the capital stock of All Trust Management, Inc. to Sidharth Sethi and Mad Twist without notice to the Landlord on November 29, 2018. DE 91-18 at 6, p.96:3-11; DE 91-28 at 6-7, p. 129:1-130:15. All Trust Management, LLC never assigned the lease to All Trust Management, Inc. DE 91 at ¶68; DE 94 at ¶68. Plaintiffs understood the implications – that the Landlord could change the lease rate and possibly add other provisions. DE 91 at ¶69; DE 94 at ¶69; DE 91-29. Thus, Plaintiffs insisted on structuring the sales transactions as a stock sale, representing that the leasehold interest would transfer and avoid renegotiating a new lease with the Landlord. DE 91 at ¶70; DE 94 at ¶70; DE 91-29. Defendant

Sidharth Sethi never spoke to the Landlord prior to closing on the sale of the restaurant.  DE 86-2 at ¶44; DE 91 at ¶44.  On or around May 2019, Defendant Sidharth attempted to exercise the Lease Option Term.  DE 91 at ¶73; DE 94 at ¶73.

On May 27, 2019, Defendants, through All Trust Management, Inc. as Tenant, executed a First Addendum to Indenture of Lease for The Twisted Tuna premises with Red Sky, Inc. as Landlord ("Lease Addendum").  DE 91-20.  The Lease Addendum, among other things, modified the rent due under the Lease.  *Id.*  In particular, the Addendum provides that "the Parties agree the appropriate rent, based upon the current 'Fair Market Value', effective June 1, 2019, is [$21,600] per month."  *Id.*  Although a partial forbearance structure was agreed upon, Defendant All Trust became obligated for the minimum rent amount of $21,600 per month with 3% increases thereafter in the following four years.  *Id.*

D.      The Fysh Bar & Grill Restaurant in Port Orange, Florida

In 2019, Defendant Sidharth Sethi began exploring an additional restaurant location near Jacksonville, Florida.   On April 10, 2019, Plaintiffs Gibbs and Riley signed a letter on behalf of Tuna Family stating, in part, that "All Trust Management Inc may be granted permission to operate additional business locations . . . in Licensor's sole discretion."  DE 91-17.  On June 26, 2019, Defendant Sidharth Sethi executed a non-binding letter of intent issued by a broker indicating that "Twisted Tuna" would be the tenant of an 8,000 square foot facility in Jacksonville, Florida.  DE 86-3 at 166-170.  In September 2019, Sidharth Sethi sent an email discussing terms for a loan, which contained a business plan for "a seafood restaurant in Port Orange" called Fysh Bar & Grill ("Sept. 2019 Business Plan").  DE 86-3 at 142-144; 177-84; DE 103 at ¶47; DE 109 at ¶47; DE 109-11 at 3-9.  In the email, the Sept. 2019 Business Plan includes, in part, the following statements:

1. Summary of Fysh Bar & Grill.  Fysh Bar & Grill will be a replication of our current flagship restaurant, The Twisted Tuna.  Fysh will consist of the same highly successful waterfront, mixed dining concept with a few additions.  Fysh Bar & Grill will serve of [sic] a mix of authentic American, Japanese, and Italian Cuisines within a family friendly atmosphere.  It will have 4 separate kitchens, 3 full bars, a 300-seat banquet facility, daily live entertainment, and an authentic modernized gelato station.

2. Summary of The Twisted Tuna.  The Twisted Tuna has been one of the most successful family owned restaurants in Florida.   The restaurant opened approximately 5 year ago and has been increasing in revenue ever since. . . . The Twisted Tuna concept consists of multiple different eatery and drinking scenes under one roof along with daily live entertainment, all of which is right on the waterfront.   The restaurant's phenomenal views, entertainment attractions, and wide variety of eating options make The Twisted Tuna an extremely unique and differentiated all-in-one concept.

3. Reason for Rebranding?  The sellers of The Twisted Tuna currently own the brand.  All of our growth strategies need approval from them.  Instead of being limited under their name and policies, we have decided to create our own brand while duplicating our Tuna concept. . . . Rebranding to Fysh would allow our talented chefs and management team to come together and push ideas which would further enhance our already successful concept.
. . .

Fysh Bar & Grill will be marketed as a sister company of The Twisted Tuna so we can spread the word of our new brand and gain trust and interest from our current customer base.
. . .

4. Management & Training. . . . We will use our main management members at The Twisted Tuna to train our team in Port Orange.  Our current management understands the ins and outs of our business and will easily be able to train and pass on their knowledge to our Fysh staff.

Furthermore, training will not be difficult since we are implementing the exact same policies, procedures, and structure within Fysh as we currently have at The Twisted Tuna.
. . .

5. Fysh's menu will be extremely similar to our current menu at The Twisted Tuna, which can be viewed on our website (thetwistedtuna.com).  With that being said, our chefs will train our kitchen staff at Fysh on how to make the exact same food, which has been a pivotal part of our success at The Twisted Tuna.

DE 109-11 at 3-9.

On January 27, 2020, Sidharth Sethi posted a 13-minute documentary video on YouTube about the Fysh Bar & Grill in which he stated that the restaurant's concept was "somewhat based" on The Twisted Tuna.  DE 103 at ¶48 (citing https://www.youtube.com/watch?v=ZUMHs3mJ-wU); DE 109 at ¶48.  Sidharth Sethi also commented that Fysh Bar & Grill would be a waterfront concept with a large menu.  DE 103 at ¶48; DE 109 at ¶48.

On March 10, 2021, Sidharth hosted a groundbreaking ceremony for the Fysh Bar & Grill in Port Orange, Florida.  DE 109 at 12, ¶38; DE 116 at ¶38.  One of the pictures from the ceremony shows a Twisted-Tuna-branded water bottle on a table.  DE 109 at 12, ¶38; DE 116 at ¶38.  The following day, on March 11, 2021, the Daytona Beach News-Journal published an article about the groundbreaking ceremony.  DE 103-12.  The article states in part:

> Rick Julyia, [sic] director of operations for Twisted Tuna, was on hand to take part in the groundbreaking as well as oversee the serving of samples of some of the food Fysh Bar & Grill will offer to the more than 50 people in attendance.
>
> "I will be moving here to oversee this location," he said.  "Great town."  We've been coming here and looking at this location for (nearly) three years."

*Id.* at 4.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine if "a reasonable trier of fact could return judgment for the non-moving party."  *Miccosukee Tribe of Indiana of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008).  A fact is material "if it would affect the outcome of the suit under the governing law[.]".  *Id.*

When deciding a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016).  Courts do not weigh conflicting evidence or make credibility determinations. *Furcron*, 843 F.3d at 1304; *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).  If a genuine dispute of material fact exists, the Court must deny summary judgment. *Skop*, 485 F.3d at 1140.

The moving party bears the initial burden to demonstrate the absence of a genuine issue as to any material fact. *Fickling v. United States*, 507 F.3d 1302, 1304 (11th Cir. 2007).  "If the moving party meets this burden, the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (internal quotation marks and citation omitted).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

On March 16, 2021, Plaintiffs filed a ten-count Third Amended Complaint ("Complaint") (DE 83) against the Defendants alleging the following causes of action:

| Count | Cause of Action | Against |
|---|---|---|
| I | Infringement of U.S. Trademark No. 4670129 – 15 U.S.C. § 1114(1) | Sidharth Sethi<br>Mad Twist, LLC<br>All Trust Management, Inc. |
| II | Unfair Competition and False Designation of Origin – 15 U.S.C. § 1125(a) | Sidharth Sethi<br>Mad Twist, LLC<br>All Trust Management, Inc. |
| III | Fraud | Sidharth Sethi<br>Amit Sethi |
| IV | Breach of Promissory Note - $1.75MM | Sidharth Sethi<br>SamJ Investments Inc.<br>Italeats Inc. |

| | | |
|---|---|---|
| V | Breach of Absolute Unconditional Continuing Gty Agmt - $1.75MM | Sidharth Sethi<br>Amit Sethi |
| VI | Breach of Guaranty Agreement - $490k | Sidharth Sethi |
| VII | Declaratory Judgment (that Plaintiff Tuna Family Mgmt Inc. is entitled to terminate License Agmt) | All Trust Management, Inc. |
| VIII | Breach of License Agmt | All Trust Management, Inc. |
| IX | Breach of Promissory Notes ($490k and $1.75MM) | Mad Twist, LLC<br>All Trust Management, Inc. |
| X. | Tortious Interference with a Business Relationship | Sidharth Sethi<br>Amit Sethi |

DE 83. For their part, Defendants seek damages, among other relief, for fifteen counterclaims against Plaintiffs Tuna Family, Gibbs, and Risley as follows:

| Count | Cause of Action | Against |
|---|---|---|
| I. | Breach of Contract – License Agreement | Tuna Family |
| II. | Fraud in the Inducement - $1.75MM Promissory Note | Gibbs/Risley |
| III. | Negligent Misrepresentation | Gibbs/Risley |
| IV. | Fraud in the Inducement - $1.75MM Sidharth Gty Agmt | Gibbs/Risley |
| V. | Negligent Misrepresentation - $1.75MM Sidharth Gty Agmt | Gibbs/Risley |
| VI. | Fraud in the Inducement – Amit Gty Agmt | Gibbs/Risley |
| VII. | Negligent Misrepresentation - Amit Gty Agmt | Gibbs/Risley |
| VIII. | Fraud in the Inducement - $490k Promissory Note | Gibbs/Risley |
| IX. | Negligent Misrepresentation - $490k Promissory Note | Gibbs/Risley |
| X. | Fraud in the Inducement – $490k Sidharth Gty Agmt | Gibbs/Risley |
| XI. | Negligent Misrepresentation - $490k Sidharth Gty Agmt | Gibbs/Risley |
| XII. | Tortious Interference | Tuna Family/Gibbs/Risley |
| XIII. | Breach of Contract - Indemnification | Gibbs/Risley |
| XIV. | Breach of Contract (Stock Sale Agreement) | Gibbs/Risley |
| XV. | Conversion | Gibbs/Risley |

DE 84 at 31-79.

In their Motion for Partial Summary Judgment, Plaintiffs request summary judgment with respect to two matters: (1) Count 7 of the Complaint seeking a declaration permitting cancelation of the Licensing Agreement and (2) precluding the Lease for the Restaurant from serving as a basis

for claims of fraud and misrepresentation in Defendants' Counterclaims 2-11 and 14.  DE 86.  I discuss each in turn.

## I.   Count 7 of the Complaint Seeking a Declaration that Plaintiffs are Entitled to Terminate the Licensing Agreement

With respect to Count 7 of the Complaint, Plaintiffs request a declaration that they are entitled to terminate the Licensing Agreement.  DE 86 at 7-11.  Plaintiffs argue that they are entitled to terminate the Licensing Agreement on two separate grounds: (1) Defendants materially breached the agreement and (2) they have satisfied the requirements for termination as provided for in the agreement.  For the reasons set forth below, Plaintiffs fail show there are no genuine disputes in the record regarding these issues.  Thus, summary judgment is not warranted on this basis.

### A.  Failure to Demonstrate Material Breach

"It is an established principle of contract law that an injured party may terminate a contract for breach only if the breach is 'material.'" *Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989) (addressing an alleged breach of contract by a franchisee).  The general question to be answered is whether, despite the breach, the non-breaching party has received a substantial portion of its bargain.  *Id.*  Courts also consider whether compensation can make up for any benefit deprived, whether the party seeking to avoid termination will suffer forfeiture, and whether the breaching party's conduct aligns "with standards of good faith and fair dealing."  *Id.*  In particular, courts "recognize[] that termination of a franchise is a drastic remedy where neither party has caused irreparable harm."  *Id.* at 1553.

Plaintiffs fail to meet their initial burden to demonstrate the absence of genuine disputes about whether Defendants breached the Licensing Agreement and, if so, whether those breaches

are material.  Plaintiffs allege that Defendants breached the Licensing Agreement in the following ways: (i) attempting to register the trademark in their own name; (ii) attempting to start a Twisted Tuna branded restaurant outside their licensed territory without prior written approval; (iii) changing the menu and prices without permission; (iv) changing the t-shirt designs without permission; (v) changing the Twisted Tuna logo design for Halloween in 2019 without permission; (vi) violating local laws relating to COVID-19 restrictions; (vii) being cited repeatedly by the local health department for health violations; (viii) creating their own web page and social media accounts without prior approval; (ix) failing to pay the $10 per month fee due under the License Agreement since March 2020; and (x) ignoring Plaintiffs' default letters.  DE 86 at 2-4, 10-11. There are genuine disputes in the record, however, about the truth of some of these assertions and whether such conduct is sufficiently "material" such that Plaintiffs may legally terminate the Licensing Agreement.

First, the record contains conflicting evidence about whether the alleged breaches occurred. With respect to the allegation that Defendants attempted to register the trademark in their own name, Defendants respond that this was a "misunderstanding" and the alleged "attempt to register" was voluntarily disclosed to Plaintiffs.  DE 91-1 at ¶59; DE 91-2 at ¶59.  As to attempting to start a Twisted Tuna restaurant outside the Territory, Defendants declare that Plaintiffs agreed to allow Defendants to explore the opportunity in Port Orange and that Defendants stopped using the Twisted Tuna name in connection with this opportunity after Plaintiffs communicated that they would not authorize it.  DE 91-1 at ¶¶61-62; DE 91-2 at ¶¶61-62.  In other words, Defendants suggest that they in fact had Plaintiffs' approval, or at least thought they did, when they used the Twisted Tuna Mark initially to explore the Port Orange opportunity.   With respect to changing t-shirt designs and logo at Halloween in 2019, Defendants say that this was temporary, that Plaintiffs

14

themselves had used the same design previously, that Defendants were trying to follow Plaintiffs' example in changing the design, and that vendors, which Plaintiffs provided to Defendants, had access to the very same materials.  DE 91-1 at ¶50; DE 91-2 at ¶50.  From this information, a reasonable factfinder could infer that Plaintiffs approved the designs.  As to violating local laws addressing Covid-19, Defendants attest that they have not received any citations or warnings from any government agency concerning Covid-19 and have made reasonable efforts to enforce the wearing of masks and social distancing.  DE 91-1 at ¶¶66-67; DE 91-2 at ¶¶66-67.  Regarding health violations, Defendants contend that they immediately cured any purported violations without action.  DE 91-1 at ¶68; DE 91-2 at ¶68.  With respect to creating an independent web site and social media accounts, Defendants attest that Plaintiffs were preventing Defendants from promoting the Restaurant through these mediums.  DE 91-1 at ¶¶53, 56; DE 91-2 at ¶¶53, 56.  Moreover, while Defendants acknowledge failure to pay the $10 per month license fee since March 2020, they argue that such amount is *de minimis* and does not show that Plaintiffs failed to receive a significant portion of their bargained for exchange.  *Ron Matusalem & Matusa of Fla., Inc.*, 872 F.2d at 1551. Given these material factual disputes, summary judgment is unwarranted.

Second, it appears that Plaintiffs confirmed, at least as of August 22, 2019, that Defendants were generally in compliance with the Licensing Agreement.  Specifically, Plaintiff Gibbs emailed Defendant Sidharth Sethi on August 22, 2019 stating "[w]e were able to review and confirm that your policies and procedures, employee records, financials, menu items, prices, prep lists and order guides all appeared to be in good order."  DE 91-16 at 2. From this evidence, a reasonable factfinder could infer that alleged breaches occurring before August 22, 2019 were immaterial and therefore not a basis for termination of the Licensing Agreement.

Third, I am unable to determine whether the conduct Plaintiffs complain of breached the Licensing Agreement because the Agreement itself does not contain specific standards regarding the Restaurant's operation and Defendants attest that Plaintiffs have not provided any.  According to Defendants, Plaintiffs have failed to provide specifics regarding, *inter alia*, policies, inventory, equipment, brand imaging, colors, tableware, recipes, menus (including prices and items), ingredient lists, customer lists and other food quality standards.  DE 86-3 at 105-114; DE 91-1 at ¶39; DE 91-2 at ¶39.  While the Licensing Agreement provides generally that "Licensee shall not use the Trademark in a fashion that the Licensor deems to be contrary or may cause a detriment to the brand or concept of the Trademark," DE 86-2 at ¶31; DE 91 at ¶31, the record is insufficient at this stage to show Defendants have materially breached it.  Since genuine factual disputes exist on this issue, it must be determined at trial.

### B.  Failure to Establish Right to Termination Under Licensing Agreement

Plaintiffs also fail to show they are entitled to terminate the Licensing Agreement under its notice and cure provision.  The provision at issue states:

> In the event that Licensee fails to operate the business in accordance with existing policies, procedures, quality standards, etc., then Licensor shall give the Licensee written notice of said default and if Licensee fail[]s to cure said default within thirty (30) days of rec[ei]pt of said Notice then Licensor may terminate this Agreement by giving written notice of said termination to the Licensee.

DE 86-3 at 112.

Plaintiffs attest as of April 2021 that Defendants never cured breaches set forth in letters sent to them.  DE 86-3 at 3, ¶¶14-15; 7, ¶¶14-15.  As proof, Plaintiffs attach two letters from their counsel regarding breaches pertaining to operations of the Restaurant.  A November 11, 2020 letter ("November 2020 Letter") lists various alleged ongoing violations including: (i) changing the menu, pricing, logos and apparel; and (ii) creating a separate website and social media accounts

for The Twisted Tuna; and (iii) ignoring local ordinances relating to Covid-19.[6]  DE 86-3 at 11-12.  An earlier letter, dated October 4, 2019 ("October 2019 Letter"), put Defendant Sidharth Sethi on notice regarding "use of the company's intellectual property in the registration and creation of a website . . . and [as to] Halloween themed t-shirts."  DE 86-3 at 16.  The October 2019 Letter demanded that Defendants cease selling and using the offending t-shirts and that Defendants take down the website and transfer the domain name to Plaintiffs.  *Id.*

Defendants' respond that the Licensing Agreement is vague, so it is not clear that the breaches about which Plaintiffs complain are actually breaches.  DE 92 at 7-8, 17-18.  For example, as to menu items and pricing listed in the November 2020 Letter, the Licensing Agreement does not include "menus" as Intellectual Property nor does it require prior approval for menu changes.  DE 86-3 at 105, ¶1.2(c).  In fact, the Licensing Agreement does not specifically address menus or pricing.  DE 86-3 at 105-114.  From the record, it also appears that Plaintiffs and Defendants were in alignment regarding menus and pricing as recently as September 2020.  In testimony given on December 9, 2020, Plaintiff Gibbs stated that he "believed" Defendants' Restaurant and a new Twisted Tuna restaurant in Jupiter, FL had the same menu as of the opening of the Jupiter location in September 2020.  DE 91-18 at 230:9-24.  The parties stopped communicating because of the instant litigation, and menu changes at Defendants' Restaurant occurred thereafter.  DE 91-18 at 231:9-14.  Thus, I conclude that the extent to which unauthorized food offerings and pricing changes breach the Licensing Agreement is best left for trial.

With respect to logos and apparel, Plaintiffs' specific allegation is that Defendants "changed t-shirt designs without permission and for Halloween in 2019 even changed the Twisted

---

[6] The letter also lists violations relating to trademark infringement.  DE 86-3 at 11 (listing violations including that Defendants were "using the Mark [impermissibly] outside of the Territory . . . [,] seeking a trademark registration for the Mark . . . [and,] associating or commingling the Mark").  Plaintiffs are not seeking summary judgment on their Trademark Infringement claims (Counts 1 and 2).

Tuna logo without permission." DE 86 at 10; DE 94-1 at 3, ¶13; DE 94-2 at 3, ¶13. As previously discussed, Defendants contend that the Halloween changes were temporary (DE 91-1 at ¶50; DE 91-2 at ¶50), and it is unclear from the record what other unauthorized changes have occurred, which were not cured following written notice, relative to logos and branded apparel. Accordingly, Plaintiffs do not establish that they are entitled to terminate under the notice and cure provision on the basis that Defendants made unauthorized changes to logos and apparel.

Regarding Defendants' creation of a separate website and social media accounts, Defendants contend that Plaintiffs did not provide sufficient promotion of, and services to, Defendants' Restaurant through these mediums. DE 91-1 at ¶53; DE 91-2 at ¶53. Specifically, Defendant Sidharth Sethi attests that Plaintiffs "were not making any updates, revisions, or changes to the generic Twisted Tuna website[,] . . . would not add All Trust's promotions, specials, restaurant news, or new menus to the website[,] . . . would not keep the website online and available, allowing numerous periods of extensive downtime [and] . . . would not forward All Trust's customer's comments, questions, or requests to All Trust." DE 91-1 at ¶53. Sidharth Sethi also declares that when there was joint access to a Facebook page, "Plaintiffs often edited, modified, or deleted All Trust's Facebook content arbitrarily and without explanation [and then] . . . removed All Trust's access to the Facebook page [so that] All Trust could not post any new content, promotion, and events." DE 91-1 at ¶57. Second, Defendants argue that the Licensing Agreement grants an exclusive right within the defined territory to operate the Restaurant and does not prohibit operation of a website in this regard. DE 92 at 9; DE 91-1 at ¶52. Given the lack of specificity in the Licensing Agreement regarding Internet and social media and Defendants' allegations that Plaintiffs are unreasonably precluding Defendants from promoting their Restaurant

via these mediums that Plaintiffs' control, I find that the issue of whether Defendants' independent operation of these mediums violates the Licensing Agreement is better determined at trial.

As to Covid-19 violations, Plaintiffs argue that photographs posted on social media show that Defendants had "a lack of concern for keeping patrons safe and [did not] mak[e] any attempt to [require] masks and abide by social distancing guidelines." DE 94-1 at 4, ¶14; DE 86 at 10. As previously discussed, Defendants attest that they have not received any citations or warnings from any government agency concerning Covid-19 and have made reasonable efforts to enforce the wearing of masks and social distancing. DE 91-1 at ¶¶66-67; DE 91-2 at ¶¶66-67. Thus, Plaintiffs fail to show the lack of a genuine dispute regarding Defendants' adherence to Covid-19 safety protocols.

For all the above reasons, I find that the record fails to establish that Plaintiffs are entitled as a matter of law to terminate the subject agreement under its termination provisions. Accordingly, whether alleged breaches were properly noticed or cured is more properly determined at trial. Thus, Plaintiffs' Motion for Summary Judgment on Count 7 is denied.

## II.  Counterclaims 2 through 11 and 14 Alleging Fraud and Misrepresentation Related to Terms of the Lease Agreement

Plaintiffs seek partial summary judgment to preclude Defendants from relying upon the Lease Agreement as grounds for their counterclaims of fraud, negligent misrepresentation, and breach of contract. DE 86 at 5-6, 16-20. In the alternative, Plaintiffs seek to strike Defendants' claim to damages with respect to their assumption of the Lease Agreement. *Id.*

To consider Plaintiffs' argument in this regard, Defendants' counterclaims relating to fraud and misrepresentation must be examined. According to Defendants, in negotiating the sale of the Restaurant, Plaintiffs made several fraudulent misrepresentations. For one, Plaintiffs represented

that they had a valid Lease Agreement for the Restaurant property with rent that would increase only at a fixed maximum percentage rate. Defendants say the Lease Agreement was not valid, however, because it was entered into with the Landlord by All Trust Management, LLC, which Plaintiffs dissolved four days after entering into the Lease. DE 84 at 41, ¶44. Plaintiffs created a new company, All Trust Management, Inc., and never advised the Landlord of this change. *Id.* Plaintiffs sold the stock of All Trust Management, Inc. to Defendants representing that All Trust Management, Inc. had a valid lease for the Restaurant. *Id.* at 37-41, ¶¶32-37, 44. When Defendants attempted to exercise the first option to renew the Lease, the Landlord dictated new lease terms including an adjustment of the rent on the basis that the Lease was not valid. *Id.* at 41, ¶44. Defendants contend that they relied to their detriment upon Plaintiffs' misrepresentation in entering the Sales Transaction. *Id.* at 37-39, ¶¶32-37.

Defendants also claim they were harmed and defrauded by alleged misrepresentations Plaintiffs made in reference to the Restaurant's financial performance and financial statements. DE 84 at 33-37, ¶¶18-31. In particular, Defendants claim that monthly profit and loss statements and general ledger accounts, which Defendants acquired access to after the Sales Transaction, reflect profits that are materially less than what was included on Financial Statements Sidharth Sethi received prior to the Sales Transaction. *Id.* at 39-40, ¶¶38-39. During the due diligence process between December 2017 and the Sales Transaction in November 2018, Defendant Sidharth Sethi requested and received various documents that Defendants refer to as Financial Statements: (i) a business listing information sheet; (ii) analyses of income and expenses for 2015 and 2016; (iii) consolidated financial statements for 2015 and 2016; (iv) sales summaries from the company's point of sale system for 2017 and 2018; (v) profit and loss statements, balance sheets, and accounts payable aging reports for 2016, 2017, and the first half of 2018; and (vi) income tax returns for All

Trust for 2015-2017.  *Id.* at 33-34, ¶18.  Defendants contend that Plaintiffs "made hundreds of modifications to the books and records of the Restaurant" after the listing broker for the sale of the Restaurant advised Plaintiffs in August 2018 that the financial information they intended to present to Sidharth Sethi "would raise questions" regarding the Restaurant's financial performance.  *Id.* at 35-36, ¶25.  Defendants allege that Plaintiffs made false and inaccurate entries in the general ledger, often at times preceding delivery of Financial Statements to Sidharth Sethi, in order to suggest that the Restaurant was on track to earn a $1 million net income in 2018, which significantly overstated the value of the Restaurant.  *Id.* at 36, ¶¶27-28.

Plaintiffs are not entitled to summary judgment in their favor on the lease issue.  First, summary judgment is not appropriate when not dispositive of a claim, affirmative defense, or an element thereof.  *Glob. Digital Sols., Inc. v. Grupo Rontan Electro Metalurgica, S.A.*, No. 18-80106-CIV, 2019 WL 8275153, at *2-3 (S.D. Fla. Nov. 27, 2019) (examining the 2010 amendments to Fed. R. Civ. P. 56(a) and determining that Plaintiff's motion for summary judgment was required to address a claim, an affirmative defense, or an element thereof).  Here, Plaintiffs seek partial summary judgment as to one alleged fact, among others, that form the basis of Defendants' counterclaims and defenses pertaining to fraud and misrepresentation.  Since statements pertaining to the Lease Agreement are only one category of misinformation Defendants complain of, the resolution of the issue pertaining to the Lease Agreement will not by itself be determinative of any element of a claim or affirmative defense in this case.  Therefore, a decision on the discrete issue of misrepresentation pertaining to the Lease is not appropriate for summary judgment.

Additionally, as for Plaintiffs' argument that they gave Defendants the Lease Agreement before the sale and the increase in rent to market rates was obvious from the language of the Lease

Agreement, I note that the Lease Agreement contains conflicting terms on this issue.  The Lease both states that the rent shall adjust to market upon exercise of an option to renew <u>and</u> that the rent during the initial year of the option terms shall be just 3% higher than the previous year.  DE 86-3 at 206-08.  Thus, I am not convinced at the summary judgment stage that the Lease makes a rent increase to market rates so obvious that Defendants' reliance on a representation about rent increases is unjustified.

With respect to the argument that the name change should have been obvious, this is not a situation where examining a chain of title would have revealed the Lease's invalidity making reliance on a representation of validity unjustifiable.  *See, e.g., M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95 (Fla. 2002) (explaining that examination of a chain of title in a real estate transaction is an expected step of due diligence such that "reliance [on a conflicting representation] is not justified and a cause of action will not exist" in the absence of that due diligence).  Indeed, by the Lease's own terms, it was not to be recorded in the chain of title.  DE 86-3 at 226-27 (stating that "Tenant shall not record this Lease without consent of Landlord").  Thus, at the summary judgment stage, I am not convinced that it should have been obvious to Defendants that the Lease was signed by a company with the same name except with respect to an ending designation of "LLC" versus "Inc."

Reliance, knowledge and obviousness are fact-intensive inquiries, which are not appropriate for summary judgement.  "Determining whether [a party] knows that a representation is false or whether falsity is 'obvious' to [a party] requires 'consideration of the totality of the circumstances surrounding the type of information, the nature of the communication between the parties, and the relative position of the parties.'"  *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Azam*, 813 So. 2d at 95).  A "trial court must always evaluate the facts of the situation . .

. and resolve the issues on a case-by-case [basis]" as far as determining whether reliance was justified. *Id.* at 95-96. Furthermore, "a plaintiff 'may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him.'" *Democratic Republic of the Congo v. Air Cap. Grp., LLC*, No. 12-20607-CIV, 2013 WL 3223686, at *6 (S.D. Fla. June 24, 2013) (quoting *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010)).

As to Plaintiffs argument regarding Defendants' lack of due diligence, such lack of investigation about the validity of the Lease does not automatically make reliance unjustifiable. *Democratic Republic of the Congo*, 2013 WL 3223686, at *6. Rather, Defendants' diligence is an issue more properly considered as part of the "totality of circumstances" at trial. *Butler*, 44 So. 3d at 105.

## CONCLUSION

Accordingly, for the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Summary Judgment (DE 86) is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 28th day of June, 2022.

_____
SHANIEK MILLS MAYNARD
UNITED STATES MAGISTRATE JUDGE